*B. F. Claypool,* for appellants.

*J. C. McIntosh,* for appellees.

---------o---------

## Rush and Others *v.* Megee and Others.

WILL.—*Unsound Mind.*—Where a will was contested on the ground that the testator was of unsound mind, and the answer was the general denial;

*Held,* that every man is presumed to be sane or of sound mind, until the contrary is made to appear by evidence.

*Held,* also, that when it is shown by evidence that a man has been at one time insane or of unsound mind, the law presumes that he remains so, until it is shown by evidence that he has been either wholly or temporarily restored to sanity or soundness of mind.

SAME.—*Husband and Wife.—Witness.*—A person who was a plaintiff and also the husband of one of the plaintiffs contesting a will was properly excluded as a witness (PETTIT, J., dissenting).

SAME.—*Evidence.*—Where, on the trial of an action to contest a will, it had been shown that the testator, many years before the making of the will, had mysteriously left his home and gone to Kentucky and remained some time, and while there had shot himself, one of the plaintiffs, a daughter of the testator, was asked, while under examination as a witness for the plaintiffs, " What was said, if anything, to the defendants, or the family in the presence of the defendants, in relation to the absence of your father at the time he was in Kentucky ?"

*Held,* that the question was too loose and broad to be permitted.

SAME.—*Cross Examination.*—Where a witness had testified to facts and circumstances strongly tending to show that the testator was insane before the execution of the will, and about the time the witness made a proposition to purchase

land from him, the following question was asked the witness on cross examination: "If your proposition to purchase the land adjoining you from the testator had been accepted by him, would you have taken a conveyance from him?"

*Held*, that this was within the reasonable limits of a cross examination.

SAME.—*Expert.*—A physician, an expert, was asked this question: "If at any time or times before the making of his will, the testator was the subject of a delusion on the subject of poisons, and that delusion had relation to any of his sons-in-law, then, judging from the evidence of his acts and language on that day, and from all the evidence in the case, what was, his condition at the time of making his will?"

*Held*, that the question was not a proper one to be answered by the witness; as an expert is not to judge of the credit of the witnesses or truth of facts testified to.

SAME.—*Rebutting.*—This question was asked an expert in rebutting evidence: "State whether the evidence introduced by the defendants, in connection with the evidence introduced by the plaintiffs, indicates to you that there was a lucid interval or not at the time the testator made his will."

*Held*, that the question was improper for the same reason as the last one."

SAME.—A witness for the defendants, an expert, having given his opinion from all the facts, in favor of the soundness of mind of the testator, was asked on cross examination this question, warranted by the evidence: "Suppose a man start suddenly from his tea table, under an impression that some one is at his door, when there has been no sound, and the door is closed, seize his gun, making out, and afterwards assert that he chased from his door a very near relative of the family, who lived close by, and that he finally disappeared from him in a cornfield; supposing him to be honest in his belief, and that no one was in fact at his door, what do you think of his mental condition?"

*Held*, that the question was admissible on cross examination.

SAME.—*Witness.*—*Opinion.*—A witness who had testified that he had known the testator intimately for many years; that he had officiated at the marriages of all the testator's children but one; that he knew him in church and had been with him many times, was asked the following questions: "What impression did the facts stated by you make upon you as to the soundness of the testator's mind?" Answer. "From the facts which I have detailed there was no impression made on my mind as to the testator's sanity." Second. "From the facts stated by you, what is your opinion as to the soundness of the testator's mind?" There was no answer to this question in the record. Third. "At the time of your intercourse with the testator, what was your opinion of the soundness of his mind, judging from the facts you have stated to the jury?" "Answer. "I had formed no other opinion than that he was a man of sound mind."

*Held*, that the questions were all proper.

APPEAL from the Rush Common Pleas.

PETTIT, J.—This suit was brought to contest the will of John Megee, deceased. A trial by jury was had, which re-

Rush and Others *v.* Megee and Others.

sulted in a verdict for the defendants below, who are appellees here. Motion for a new trial was overruled, exceptions properly taken, judgment on the verdict, and appeal to this court.

The complaint charges that at the time of the execution of the will the testator was of unsound mind; that the will was unduly executed by reason of duress and fraud; and issue was formed by the general denial. There are, in form, fourteen errors assigned, but in fact there is but one assigned error, the thirteenth in number, which is that the court erred in overruling the appellant's motion for a new trial. The twelve preceding assignments are only causes why a new trial should have been given, and are proper to be considered under the assignment of error for refusing to grant a new trial. The fourteenth is that the court erred in rendering judgment on the verdict for the appellees. This is not properly assignable as error; for after the motion for a new trial was overruled, it was, as a matter of course, the duty of the court to render judgment on the verdict.

We lay down these rules of law: first, every man is presumed to be sane or of sound mind until the contrary is made to appear by evidence; second, when it is shown by evidence that a man has been at one time insane or of unsound mind, the law presumes that he remains so, until it is shown by evidence that he has been, either wholly or temporarily (called a lucid interval), restored to sanity or soundness of mind. It follows, that if the appellants had proved that the testator had been of unsound mind at any time before making his will, it then devolved upon the appellees to show that he had been wholly restored, or that at the time of making the will he had a lucid interval.

The evidence is very voluminous, covering about two hundred pages, and cannot be set out at length here, nor successfully abbreviated in this opinion. This is not attempted to be done in the abstract or brief; but we have carefully read it, and on the part of the plaintiffs below (appellants here) it very strongly tends to prove that the testator had

been insane or of unsound mind for and during many years previous to making the will. The evidence is so strong on this question that it would, unrebutted, fully justify the jury in finding that he was of unsound mind. The evidence of the defendants was mostly directed to show that he had been somewhat successful as a farmer; that he took interest in public matters, political and others; and that at the time of making the will he was sane, or at least that he had at that time a lucid interval. There is nothing in the will itself to show that the testator was of unsound mind, unless it is to be found in the great inequality in the disposition of his property among his children, which would seem to be unnatural and unreasonable, without some good cause or reason assigned for it.

The first question urged for which a new trial should have been granted is, that the court refused to allow Thomas N. Linck, one of the plaintiffs, and husband of Manetta Linck, also one of the plaintiffs, and daughter of the testator, to testify as a witness. Our law allows all parties to a suit like this to testify, except that husband and wife shall not testify for or against each other. A majority of the court hold that Linck was properly excluded as a witness, PETTIT, J., dissenting.

The second reason for a new trial is, that on the cross examination of one Lakin, a witness for the plaintiffs, the defendants having procured the witness to say that he had tried to buy a piece of land from the testator, asked him this question, which was allowed to be answered over the objections of the appellants: " If your proposition to purchase the land adjoining you from the testator had been accepted by him, would you have taken a conveyance from him?"

The witness had testified to facts and circumstances strongly tending to show that the testator was insane before the execution of the will, and about the time the proposition was made to purchase lands of him. We do not think this question was beyond the reasonable limits allowed in a cross examination, for it was calculated to test or try the intelli-

gence or honesty of the witness; but, however this may be, it did not do the appellants any injury, for the answer was more favorable to them than to the appellees.

It had been shown by the evidence, that many years before the making of the will, the testator, then residing in Rush county, Indiana, had mysteriously left his home without the knowledge of his family, and had been gone some time. While Mrs. Margaret Rush, one of the plaintiffs, and daughter of the testator, was on the stand as a witness for the plaintiffs, she was asked: " What was said, if anything, to the defendants, or the family in the presence of the defendants, in relation to the absence of your father at the time he was in Kentucky ?"

The evidence shows that the testator in this absence had gone to Kentucky, and, among other wild and irrational acts, had shot himself; but we think this question was too loose and broad to be asked, and that the court committed no error in refusing it.

The court permitted the appellees, over the objection of the appellants, to ask Dr. Athon, an expert, this question: " If, at any time or times, before the making of his will, John Megee was the subject of a delusion on the subject of poisons, and that delusion had relation to any of his sons-in-law, then, judging from the evidence of his acts and language on that day, and from all the evidence in the case, what was his condition at the time of making his will?" Some of the witnesses had testified to facts and circumstances tending to show, and had given their opinions, that the testator was of unsound mind; while others had testified to facts and circumstances, and given their opinions, that he was of sound mind. We are not enamored with expert testimony, however procured or presented. The best discussion of and collection of authorities on this subject we have ever seen is published in the January and April numbers of the Law Review for 1871. The article took the first prize at the Harvard Law School, May 1, 1870. We quote from it: " Lord DENMAN said: ' It may be that medical men may be

more in the habit of observing cases of this kind than other persons, and there may be cases in which medical testimony may be essential, but I cannot agree that moral insanity can be better judged of by medical men than by others.' *Reg.* v. *Oxford,* 9 C. & P. 525, 547.

"'Experience,' said Mr. Justice GRIER, 'has shown that opposite opinions of persons professing to be experts may be obtained to any amount, and it often happens that not only many days, but even weeks, are consumed in cross examinations to test the skill or knowledge of the witnesses and the correctness of their opinions, wasting the time of the court and wearying its patience, and perplexing ·instead of elucidating the question involved in the issue.' *Winans* v. *N. Y. & Erie R. R.,* 21 How. 88, 100.

"Chief Justice CHAPMAN said, in a late case in Massachusetts: 'I think the opinions of experts are not so highly regarded now ·as they formerly were; for while they often afford great aid in the determination of facts, it often happens that experts can be found to testify to any theory, however absurd.' Trial of Samuel M. Andrews, p. 256.

"Lord CAMPBELL said, in the case of the *Tracy Peerage,* 10 C. & F. 154, 191 : 'I do not mean to throw any reflection on Sir Frederick Madden. I dare say he is a very respectable gentleman, and did not mean to give any evidence that was untrue; but really this confirms the opinion I have entertained, that hardly any weight is to be given to the evidence of what are called scientific witnesses. They come with a bias on their minds to support the cause in which they are embarked.'

"Judge McLEAN also bears witness to the remarkable conflict that is generally displayed in the examination of scientific witnesses: 'The opinions of the experts who have been examined are in conflict; and so far as my experience goes, this has been uniformly the case where experts have been examined.' *Allen* v. *Hunter,* 6 McLean, 303. In this case, eight doctors deposed in favor of the plaintiff, and eleven in favor of the defendant. In the famous Freeman

trial, nine physicians and experts in insanity deposed one way, and seven quite as positively the other. In the Andrews trial, Dr. Jarvis swore positively to his belief that the prisoner was afflicted, at the time of the killing, with momentary insanity, maniac paroxysm, or *mania transitoria;* while Dr. Choate swore as distinctly the other way, on the ground that there was no such disease known to science.

"In England, the expert is not allowed to give his opinion upon all the evidence; but certain facts and particulars in evidence may be stated to him, and he is to say what they indicate, upon the supposition that they are true. *Reg.* v. *Frances,* 4 Cox. Cr. C. 57; *Doe* v. *Bainbrigge, id.* 454.

"In the case of M'Naghten, tried in 1843 for the murder of Mr. Drummond, an expert who had heard all the evidence was asked his opinion of the prisoner's state of mind in this form: 'Judging from the evidence which you have heard, what is your opinion as to the prisoner's state of mind?' Out of this case, several questions arose which were proposed in an abstract form by the House of Lords to the judges of England. One of these questions was this: 'Can a medical man, conversant with the disease of insanity, who never saw the prisoner previous to the trial, but who was present during the whole trial and the examination of all the witnesses, be asked his opinion as to the state of the prisoner's mind at the time of the commission of the alleged crime, or his opinion whether the prisoner was conscious at the time he was doing the act that he was acting contrary to law, or whether he was laboring under any and what delusion at the time?' Mr. Justice MAULE thought the question could be asked, according to the authorities and the prevailing usage, though it would be open to the objection, that as the 'opinion of the witness is founded upon those conclusions of fact which he forms from the evidence, and as it does not appear what those conclusions are, it may be that the evidence he gives is on such an assumption of facts as make it irrelevant to the inquiry.' All the other judges replied as follows: 'We think the medical man,

under the circumstances supposed, cannot in strictness be asked his opinion in the terms above stated, because each of those questions involves the determination of the truth of the facts deposed to, which is for the jury to decide; and the questions are not mere questions upon matters of science, in which case such evidence is admissible.   But where the facts are admitted, or not disputed, and the question becomes absolutely one of science only, it may be convenient to allow the questions to be put in that form, though the same cannot be insisted upon as matter of right.'   *M'Naghten's Case,* 10 C. & F. 200; 67 Hansard, 288, 714.

"In the trial of Earl Ferrers, 19 Howell St. Tr. 943, the question there objected to was thus expressed: ' Please inform their lordships whether any and which of the circumstances which have been proved by the witnesses are symptoms of insanity.' Earl Hardwicke said, ' This question is general, tending to ask the doctor's opinion upon the result of the evidence, and is rightly objected to.   If the noble lord will divide the question and ask whether this or that particular fact is a symptom of lunacy, I dare say there will be no objection.'

" In the discussion in the House of Lords on the M'Naghten case, Lord Brougham thus declared his view of the extent of the testimony to be derived from medical witnesses in cases of insanity: ' You shall ask them if such a fact is an indication of insanity, or not; you shall ask them, upon their experience, what is an indication of insanity; you shall draw from them what amount of symptoms constitute insanity; but you must not ask a witness whether the facts sworn to by other witnesses preceding him amount to a proof of insanity.' 67 Hansard, 614; Ray's Med. Juris. of Insanity, 574.

"It is not the province of an expert to draw inferences of fact from the evidence, but simply to declare his opinion upon a known or hypothetical state of facts.   *United States* v. *McGlue,* 1 Curtis C. C. 1.   Experts are not to judge of the credit of the witnesses, or of the truth of the facts testi-

fied to by others.    *Com.* v. *Rogers,* 7 Met. 500; *Fairchild* v. *Bascomb,* 35 Vt. 398."

Many other cases and authorities are cited in the Law Review above referred to, which are worthy of the careful attention of the student and the practicing lawyer, but we deem it unnecessary to further copy from or cite them.

We hold that the court erred in allowing the question as put to be asked of, or answered by, Dr. Athon.    1 Greenleaf's Ev. 440; *The People* v. *Lake,* 12 N. Y. 358.

It is insisted that the court erred in not allowing the appellants to ask Dr. Marshall Sexton, in rebutting, the following question : " State whether the evidence introduced by the defendants, in connection with the evidence introduced by the plaintiffs, indicates to you that there was a lucid interval or not, at the time John Megee made his will."

This question was properly refused by the court, upon the authorities cited above, as to the question asked Dr. Athon.

It is insisted that it was error in the court to refuse the appellants to ask Dr. Athon (a witness for the appellees), on cross examination, this question : " Suppose a man to start suddenly from his tea table under an impression that some one is at his door, when there has been no sound, and the door is closed ; he seizes his gun, makes out, and afterward asserts that he chased from his door a very near relative of the family, who lived close by, and that he finally disappeared from him in the cornfield.    Supposing him to be honest in his belief, and that no one was in fact at his door, what do you think of his mental condition ?"    Evidence had been given strongly tending to prove the state of facts set out and contemplated in the question.    This question was clearly admissible on cross examination, as the doctor had stated that from all the evidence he judged the testator was of sound mind; and it was strictly an hypothetical state of facts fully warranted by the evidence and the court erred in refusing it to be asked.

The court allowed the appellees to ask Dr. Athon the following question, which was objected to by the appellants:

"Is not rational conduct and coherent conversation the best evidence of the existence of a lucid interval, especially if such conduct and conversation relates to the subject of the delusion?" It was error to allow this question to be asked, as it was propounded. The doctor should not be asked what is the best evidence of sanity or of insanity, but whether a given state of facts tends to prove the one or the other condition. See the authorities above cited.

The question or objection as to the offered evidence of Drs. Sexton, Moffitt, Pugh, and Hobbs, need not be noticed, as the opinion above covers all the questions offered to be proved by them.

After D. M. Stewart had testified as a witness for appellees, that he had known the testator intimately from 1836 till his death; that he had officiated at the marriage of all of testator's children but one; that he knew him in church, and had been with him many times, etc., he was asked by appellees the following questions:

1st. What impression did the facts stated by you make upon you, as to the soundness of John Megee's mind? Answer. From the facts which I have detailed there was no impression made on my mind as to the testator's sanity.

2d. From the facts stated by you, what is your opinion as to the soundness of John Megee's mind? There was no answer to this question in the transcript.

3d. At the time of your intercourse with John Megee, what was your opinion of the soundness of his mind, judging from the facts you have stated to the jury? Answer. I had formed no other opinion than that he was a man of sound mind. It is insisted that it was error to allow these questions to be asked over the objection of the appellants.

There had been a strong effort made to prove that the testator had been of unsound mind, running through many years of the witnesses' acquaintance with him; and we can see no valid objection to the questions. It is well settled that any witness, in a contest like this, may give his opinions or impressions formed by acquaintance and conversations

with, and actions of, the person sought to be proved insane, as to his mental condition. This doctrine will be found in many of the cases above cited. See also, *Choice* v. *The State of Georgia*, 31 Ga. 424, 466.

It is insisted that the instructions, as a whole, and in detail, are erroneous. They are as follows:

"This suit is brought to contest the validity of the will of John Megee, deceased. The plaintiffs charge in their complaint, that at the time the instrument in question was executed, John Megee, the testator, was a person of unsound mind. This is denied by the defendants. The question, therefore, to be determined by your verdict in the case, is whether he was of unsound mind at the time that instrument was executed by him. The law authorizes a person of sound mind to make such disposition, by will, of his property as he chooses, no matter how inequitable or unjust that disposition may appear to others; for such want of equity his will cannot be impeached or set aside. It presumes that the party making the will was a person of sound mind, and casts upon whoever would impeach it the burthen of proving the unsoundness necessary to invalidate it. This instrument must therefore stand as the last will and testament of John Megee, deceased, until the plaintiffs have furnished evidence satisfactory to your minds, that at the time he executed it he was a person of unsound mind.

"When you retire to deliberate of your verdict, you will, therefore, be required to address yourselves to this inquiry: Has it been proven in this case, by the plaintiffs, that the testator was, at the time this instrument was executed, a person of unsound mind? The question is at once presented, who is a person of unsound mind? In legal contemplation, one who has sufficient mind to know and understand the business in which he is engaged, who has sufficient mental capacity to enable him to know the extent of his estate, the persons who would naturally be supposed to be the objects of his bounty, and who could keep these in his mind long enough to, and could, form a rational judgment in relation

to them, is a person of sound mind.  If he has not mental capacity to this extent, he would be a person of unsound mind, incapable of making a will.  If he has mental capacity to this extent, he could make a will.  Mental unsoundness may be general, it may extend to all of a man's faculties; or it may be partial, influencing or affecting only a part of his mental faculties.  If his insanity or unsoundness of mind is general, extending to all his faculties, he could not make a will. If it is only partial, it may or may not invalidate his will.

"If the evidence shows such a want of mental capacity, such general mental derangement as prevents the party from comprehending the business he has in hand, he could not make a will.  But although there may not be shown such general derangement of the faculties or want of capacity, still it is necessary that his mind should be in such a condition that he could form a rational judgment in relation to the business he was transacting.  If he was acting under the influence of a delusion which distorted his judgment in relation to those who would be supposed to be the objects of his bounty, which prevented him from arriving at rational conclusions in regard to them, he would not be competent to make a will.  A delusion exists where a person, against all evidence and probability, persists in believing as facts, matters that have no existence except in his own perverted imagination.  The man whose mind is thus preyed upon, is to that extent insane; and if such delusion enters into and influences the disposition of his property by will, his will would be void for the want of testamentary capacity; or in other words, because he was not a person of sound mind. Upon the other hand, if he understood the extent of his estate and objects of his bounty, and no such delusion existed, or if it did exist, but did not influence or affect his judgment in disposing of his estate by his will, such will would be sustained.  It is, therefore, highly essential that you should determine, from the evidence, whether or not such a delusion existed in his mind at the time this will was made.  The entire inquiry in this case is to be directed to

the time of the execution of this will; that is, to the time
when the testator signed this instrument in controversy and
caused it to be witnessed; for if a delusion had formerly
existed which rendered him wholly or partially insane, but it
had disappeared from his mind at the time the will was exe-
cuted, it could not influence this case. But while the existence
of the delusion at the time of the execution of the will must
be proven, it is not necessary that it should be proven by
evidence directed to that precise time. You have the right,
and it is your duty to consider the whole of the evidence
before you on that subject; all facts and circumstances,
and the conduct and declarations of the testator, before and
after, as well as at the time of the execution of the instru-
ment. If it is proven that the delusion existed at the time
this instrument was executed, you must further inquire
whether or not it influenced his mind in relation to those
who were properly the objects of his bounty. For these
objects you would not look outside of his own family—his
wife and children and the descendants of such children as
might be dead. If his mind was so affected by delusions,
and those delusions influenced and warped his judgment in
relation to any of those, this instrument could not stand as
his will. But although the delusions may have existed in his
mind at the time the instrument was executed, still, if they
did not influence his judgment in relation to these objects
of his bounty, his will would not be affected by their exist-
ence. To come plainly to this question, and direct your
minds squarely to it, I mean this: If he was afflicted with
delusions which related to his sons-in-law, Dr. Rush and
Mr. Link, entertained at the time of the execution of this
instrument, the belief that they designed to poison him and
persisted in that belief without reason, and against all evi-
dence or probability, and if such delusion affected his judg-
ment in disposing of his property among the members of
his family just alluded to, such disposition could not be
maintained. But if, notwithstanding he entertained such

VOL. XXXVI.—6

delusions in regard to Dr. Rush and Mr. Link, he did not permit them to affect his judgment as to the members of his family, and his mind was not influenced by them, his will would be valid. The same principle is applicable to any delusion entertained in regard to any person.

"In examining this case, then, so far as this question is concerned, you inquire, first, whether delusions existed in the mind of the testator. Second. Whether they were present in his mind at the time of making the will. These are essential to be proven in order to constitute or show that partial insanity which would warrant you in setting aside his will. You are to ask yourselves the question, whether he was the victim of delusion or delusions, and you are to carefully examine the evidence and see whether that which was operating upon his mind was a delusion or only a suspicion, or perverse opinion, or unreasonable prejudice, or mere eccentricity. It may be any of these, and still no delusion. If there was no delusion, but only perversity, or prejudice, or eccentricities of character, or suspicion, there would be no partial insanity. If, then, there was anything out of the way in regard to his mind, what was it? Your duty requires you, as it were, to look into his mind and see whether it is disordered by delusions or only wrought upon by its suspicions, or prejudices, or eccentricities. In doing this, the evidence is the light by which you must be guarded. All that he has said, and all that he has done, may properly be considered. If he consulted others upon the subject; if he took medical opinions upon the subject of poisons, or made statements of what he supposed to be facts in relation to the administration of poisons to him, or the application of it to his person, these, and any such as these, proved by the evidence, would be circumstances proper for your consideration in determining whether there was delusion in his mind or not. If such delusion ever did exist, was it in existence or had it been removed at the time the will was made? is an equally important subject of your inquiry. If it had once existed, but had ceased to be present in the

mind, it could not affect this will. And here, too, you have the right, and it is your duty to look carefully to the evidence furnished by his sayings and doings; his subsequent familiarity with the suspected persons; his trading or dealing with them, or either of them, especially in articles similar to that which he suspected to have been used in the administration of poison to him; social intercourse with them on his part. Any such facts proved by the evidence would be proper for your consideration in determining whether such delusion still existed in, or had passed away from, his mind. If there was none such in his mind, there was no such partial insanity as would invalidate his will. But if there was, it is equally important to consider whether his judgment was affected by it. The opinions he had formerly entertained as to his family, and the disposition of his property; his treatment of those against whom these delusions would be supposed to influence him, both before and after his will was executed; his conduct at the time of the execution of his will; the reasons he gave for the manner of disposing of his property; the provisions of the will itself; the amount of property he had; the circumstances of the various members of his family; his knowledge of such circumstances; every fact and circumstance, indeed, proved by the evidence is properly for your consideration in settling this question.

"Upon a careful examination of the evidence and every part of it appertaining to this matter, if it satisfies you that his mind was preyed upon by delusion, which warped his judgment in relation to those who were properly the objects of his bounty, or any of them, the instrument is not his will. If he was not the victim of delusion, or if he was, and his judgment as to such persons was not affected by it, it is his will. To enable you properly to determine the question whether there was general or partial derangement of the mind, you have brought to your aid, naturally, his own conduct, actions, language, the situation of his family, the extent and character of his estate, and also the opinions of per-

sons based upon their knowledge of him, and the opinions of persons supposed to be skilled in the science of the mind. Of the weight proper to be given to every part of this evidence, you are to be the judges. The opinions of those not skilled in the science of the mind should be judged of by the facts upon which they are predicated.

" The opinion of a witness, whose attention has been particularly called to the testator, who was familiarly acquainted with him, who had frequent opportunities of observing him, and the operations of his mind, is entitled to greater weight than that of a witness of equal sagacity whose opportunities of forming an opinion were more limited. The facts upon which the opinions of such witnesses are based have been given you, and you should weigh the opinion expressed by the facts given. The opinions of subscribing witnesses to the will should also be considered. The opinions of medical men, scientific men, commonly called experts, are also to be weighed by you. You are to determine the weight properly to be attached to the opinions of such witnesses. You are to consider their experience, the extent of their study and practice in relation to such matters, the reasonableness or unreasonableness of the opinions they have expressed, and whatever of interest they may have or manifest in regard to the case. You should consider also whether the testimony of such witnesses is partisan in its character, warped or biased by any leanings for or against any of the parties. You should consider the circumstances under which they testify; and, in short, you should scan all the evidence closely, to the end that you may give to every part of it its proper weight, neither less nor more. You are not bound to receive the opinion of any witness as conclusive in this case, nor should you exclude the opinion or testimony of any, without substantial reasons for so doing. As I have already said to you, a person of sound mind may make just such a will as he pleases, and the motives that actuated him cannot be inquired into, but when the instrument is attacked for want of mental capacity on the part of the testator, it is

Rush and Others *v.* Megee and Others.

proper for the jury to consider the will itself, and the dispo-sition made of his property by the testator therein as bear-ing upon the question of his sanity. In this case, therefore, you can consider this will; the extent of his property; what-ever he may have said at other times, as to how he intended to dispose of it; the conditions and circumstances of his fam-ily, and each and every member thereof, and every circum-stance of his conduct; his feelings, and declarations, and sentiments respecting his property and family, before, after, and especially at the time of the execution of that instru-ment. Examining, and weighing, and giving due considera-tion to every part of this evidence, you are to say whether or not there was either general derangement of his mind, or partial insanity. If it has been made to appear that his mind was unsound, either generally deranged or partially insane before the will was made, the burden of proving which is upon the plaintiffs, then the law presumes that insanity to con-tinue until it is proven that the insanity no longer exists. That presumption would not exist when insanity of only temporary character is proved. But if insanity not tempo-rary in its character is proved, then the burthen of proving that the insanity had ceased to exist is upon the defendants. You are to consider, therefore, if insanity, general or partial, and not temporary in its character, has been proved, whether or not it has been proved that a lucid interval existed at the time the will was executed. As I have said, the burthen of proving this is upon the defendants, and it behooves you to look closely to the testimony bearing upon the time when this instrument was executed, that is, the time when the instrument was signed by the testator and acknowledged to be his will. The great question is, what was his condition then? And you should scrutinize with all the care you can, what occurred on that day, in connection with the other evi-dence, to enable you to correctly understand the condition of his mind on that day.

"If insanity has been proven before the time of the execu-tion of the will, you would therefore be authorized to infer

that he was of unsound mind when the will was executed, unless the evidence satisfies you that the insanity had at that time ceased to exist.     If the evidence does not so satisfy you, you would be authorized to find this will invalid.     But if the evidence satisfies you that although there may have been insanity before, there was none at that time, you should sustain the will by your verdict; upon this branch of this case, then, I close what I have to say to you upon this subject, by repeating to you what I said in the beginning, that if he had sufficient mind at the time he made the will, to understand the business he was engaged in, to understand the extent of his property, the persons who were supposed to be the objects of his bounty, and could hold these in his mind long enough to, and could, form a rational judgment in regard to them, he was a person, in contemplation of law, of sound mind.     If he had not mental capacity to that extent, he would not be a person of sound mind, but of unsound mind, in legal contemplation.     Your verdict would be for the plaintiffs, if he had not this extent of capacity; for the defendants, if he had this extent of capacity.

"You cannot be too careful in your investigations in this case.     It is one of unusually great importance.     It demands of you a cautious, thorough examination of all the evidence, to the end that your verdict shall be strictly in acccordance with the law and the evidence."

We have given to these instructions repeated, careful, and thorough examinations, and we fully indorse them as in all respects fully applicable and warranted by the evidence in and circumstances of the case.     They show great learning, research, and care.

The judgment is reversed, at the costs of the appellees, and the cause is remanded for further proceedings not inconsistent with this opinion.*

*B. F. Claypool, D. W. Voorhees,* and *W. A. Cullen,* for appellants.

*L. Sexton, T. A. Hendricks, O. B. Hord,* and *A. W. Hendricks,* for appellees.

*Petition for rehearing overruled.