Bundy v. McKnight, Ex'r, et al.

The judgment is reversed, with costs, and the cause remanded for a. new trial.

———o———

BUNDY v. McKNIGHT, EXECUTOR, ET AL.

WILL.—*Attesting Witnesses.—Request of Testator to Witnesses.*—The witnesses to a will must attest and subscribe the will in the presence of the testator· and at his request. It is not imperative, however, that the request should proceed directly and immediately from the testator himself. If the testator requests a person to prepare his will, informing him that he desires to make his will, and the will is prepared for execution in compliance with such request, and when ready for execution, the person who prepared the will calls upon persons present, in the presence and hearing of the testator, to attest and subscribe it, and in the presence of the testator, and with his knowledge, and without objection, they attest and subscribe it as attesting witnesses, it is, in contemplation of law, attested and subscribed by the request of the testator.

INSTRUCTION.—*Law Arising from Facts.*—In instructing a jury, the court may inform them of the law arising on certain facts, if such facts are found from the evidence. It may also, without assuming that certain facts have been proved, allude to them to illustrate a principle or rule of law.

SAME.—*Contest of Will.*—In a proceeding contesting a will on three grounds, unsoundness of mind, informality in execution, and undue influence, this court would not presume that the jury were misled by an instruction in reference to unsoundness of mind, and containing no reference to the other causes, informing the jury that they might take into consideration declarations made by the testator prior to the execution of the will, in regard to· the disposition he intended to make of his property, though the court did not expressly exclude the application of that part of the instruction to the other causes of contest.

WILL.—*Mental Capacity of Testator.*—The law does not undertake to measure a person's intellect, and define the exact quantity of mind and memory a testator must possess to authorize him to make a valid will, yet it does require him to possess mind to know the extent and value of his property, the number and names of the persons who are the natural objects of his bounty, their deserts with reference to their conduct and treatment toward him, their capacity and necessity, and that he shall have sufficient active memory to retain all these facts in his mind long enough to have

his will prepared and executed; and even if this amount of mental capacity is somewhat obscured or clouded, still the will may be sustained.

SAME.—*Instruction to Jury.*—It is not error for a court to say to the jury that a large majority of wills are made when the testator is on his death-bed, and when the mind and body are more or less affected by disease and suffering, if the jury are, in addition, correctly instructed as to the mental capacity necessary to make a valid will.

SAME.—*Undue Influence.*—Influences that may be legitimately used to induce a person to make a will must be fair and reasonable.

SAME.—The undue influence that will invalidate a will may be accomplished by persuasions, importunities, force, threats, or coercion, of such character and degree that they can not be resisted.

SAME.—*Legal Presumption.*—No legal presumption of undue influence arises from the fact that the testator was on his death-bed, and surrounded by certain ones of his children who are principally benefited by the will, while the plaintiff contesting the will, also a child of the testator, was absent.

INSTRUCTION.—*Harmless Error.*—In an action to contest a will, where but one medical witness, not personally acquainted with the testator, was examined as an expert, and was called by, and testified strongly in favor of, the defendants, the plaintiff was not injured by an instruction that such evidence was of little value.

From the Washington Circuit Court.

*D. M. Alspaugh, S. B. Voyles, J. W. Gordon, T. M. Browne,* and *R. N. Lamb,* for appellant.

*H. Heffren, J. C. Lawler, T. L. Collins,* and *A. B. Collins,* for appellees.

BUSKIRK, C. J.—This was a proceeding by the appellant against the appellees, to contest the validity of the will of Christopher Bundy, deceased, and to set aside the probate thereof.

The appellant and the appellees, other than the executor, are the heirs at law of the decedent. The grounds of complaint are:

1. That the testator, at the time of the execution of such will, was of unsound mind.

2. That the formalities required by law for the due execution of the will were not observed.

3. That its execution was obtained by the undue influence

of Christopher H. Bundy and Rachael Houston, two of the appellees and the principal legatees and devisees.

Issue, trial by jury, verdict for appellees, motion for a new trial overruled, and judgment on the verdict.

The error assigned is based upon the action of the court in overruling the motion for a new trial.

The most important questions discussed by counsel grow out of the instructions given and the one refused. Counsel for appellant contend that the court erred in giving the second, sixth, eighth, ninth, fourteenth, fifteenth, sixteenth, seventeenth, and nineteenth, and in refusing to give an instruction asked by appellant. The second instruction given, and the one asked and refused, bear upon the same question and will be considered together, and they are as follows:

" 2. In this State, a will must be in writing, and must be signed by the testator himself, or by some one in his presence and with his consent, and it must be attested and subscribed in his presence by at least two competent witnesses. If a testator writes his own name, or makes his own mark to his name already written by another, in contemplation of law he signs it himself. If he takes the pen in his own hand and makes his mark, or if another person holds and guides his pen, and he touches it, and the mark is made with his assent, it is, in either mode, his signature. The witnesses must attest and subscribe the will in the presence of the testator and at his request. It is not imperative that the request should proceed directly and immediately from the testator himself. If the testator requests a person to prepare his will, informing him that he desires to make his will, and such person, in compliance with such request, prepares the will for execution, and when the will is ready for execution the person who has been called upon to prepare the will calls upon persons present, in the presence and hearing of the testator, to attest and subscribe it, and they do, in the presence of the testator and with his knowledge and without objections, attest and subscribe it as attesting witnesses, it is in contemplation of law attested and subscribed by the request of the testator."

The court refused to give the following instruction asked by appellant:

" The statute requires that a will, to be valid, must be in writing, signed by the testator, or by some one in his presence with his consent, and attested and subscribed in his presence by two or more competent witnesses. An attesting witness is a witness who subscribes his name to the will as a witness to its execution at the request of the testator. Such request by the testator is a part of the testamentary act, and must be performed by the testator. A person who signs or subscribes his name to a will as an attesting witness, but without being requested to do so by the testator, is a mere volunteer, and not, in contemplation of law, an attesting witness. It is a question for you to determine from the evidence, whether or not at least two of the witnesses whose names are signed to this will as witnesses signed the same at the request of the testator. If you find that any two of said witnesses subscribed their names to the will as witnesses at the request of the testator and in the presence of the testator, then said will is duly attested as required by law ; but if you find from the evidence that not as many as two of said subscribing witnesses subscribed their names to said will at the request of said testator, then said will was not duly attested and not duly executed, and in that event you should find for the plaintiff."

It is contended by counsel for appellant that the instruction given by the court is not the law, because a testator must request the witnesses to attest and subscribe their names to the will as witnesses, and that this request can not be made by his agent or attorney, or by any other person in the presence and hearing of the testator, and without objection from him ; and in support of these propositions, a reference is made to the following authorities: Bouv. Law Dict., vol. 1, 167 (12th ed.) ; Swift v. Wiley, 1 B. Mon. 117; Pollock v. Glassell, 2 Grat. 439; Williams Executors (5th Amer. ed.), foot note to page 74; Hayes v. West, 37 Ind. 21 ; White v. Trustees of the British Museum, 6 Bing. 310; 1 Redfield Wills (3d ed.), 215, 216, 217 ; Dewey v. Dewey, 1 Met. 349 ; Hogan

v. *Grosvenor*, 10 Met. 54; *Gamble* v. *Gamble*, 39 Barb. 373; *Sechrest* v. *Edwards*, 4 Met. Ky. 163; *Dean* v. *The Heirs of Dean*, 27 Vt. 746; *Watson* v. *Pipes*, 32 Miss. 451; *Reed* v. *Watson*, 27 Ind. 443; 2 Greenl. Ev. (10th ed.) 588, 589; *McDonough* v. *Loughlin*, 20 Barb. 258; *Coffin* v. *Coffin*, 23 N. Y. 9; *Lewis* v. *Lewis*, 1 Kern. 220; *Brinckerhoof* v. *Remsen*, 8 Paige, 488; S. C., 26 Wend. 325.

It is abundantly established by the foregoing authorities that the witnesses must attest and subscribe the will at the request of the testator. Counsel for appellees broadly admit this to be the law. This narrows the question down to whether the request must proceed directly and immediately from the testator, or whether it will be sufficient if the request is made by some person acting for and on behalf of the testator, in his presence and hearing, and with his knowledge, and without objection on his part.

We have the following statutory provision bearing upon the question:

" Sec. 18. No will except a noncupative will shall affect any estate, unless it be in writing signed by the testator, or some one in his presence, with his consent, and attested and subscribed in his presence by two or more competent witnesses; and if the witnesses are competent at the time of attesting, their subsequent incompetency shall not prevent the probate thereof." 2 G. & H. 555.

It will be observed, that the above section does not require that the witnesses shall attest and subscribe the will at the request of the testator. In that respect it differs from the New York statute, for that in express terms requires that the witnesses must attest and subscribe the will at the request of the testator, and this should be borne in mind when we come to consider some New York cases placing a construction upon such statute.

In *Gilbert* v. *Knox*, 52 N. Y. 125, it is said: " Before a will can be admitted to probate it must appear affirmatively that the statute has been complied with. But a substantial compliance is sufficient, and although the statute declares that

the witnesses must sign at the request of the testator, and that he shall subscribe the will, or acknowledge the subscription in their presence, the words of request or acknowledgment may proceed from another, and will be regarded as those of the testator where the circumstances show that he adopted them, and that the party using them in his presence was acting for him with his assent."

In *Peck* v. *Cary*, 27 N. Y. 9, the draughtsman of the will, in the presence of the testator, requested the witnesses to witness the will, and they signed it, and it was held to have been done at the request of the testator. DENIO, C. J., said: " The object of the statute is that an officious signing by witnesses, without any privity with the testator, should not be recognized as sufficient. Here, the agency of Morgan" (the draughtsman) " being established and known, the understanding of the witnesses that they came forward and signed because the testator desired them to do so, and the understanding of the testator that they came and signed at his instance, was perfect, and the privity which was the purpose of the statute was secured."

In *Rutherford* v. *Rutherford*, 1 Denio, 33, where the proof of the will became material, in an action of ejectment, it was assumed that the jury might have found a sufficient request to one of the witnesses, where it was made by the draughtsman of the will in the presence of the testator.

In *Coffin* v. *Coffin*, 23 N. Y. 9, it was objected that one of the witnesses signed without the request of the testator. The facts were, that the witnesses were called into the house and the room where the will had been prepared for execution, not by the testator, but by a person acting for him. One of the witnesses inquired of the testator if he wished him to sign or witness the paper as his will, and he answered in the affirmative, and both witnesses then signed. This was held a sufficient request to both. In the opinion of the court, by the Chief Justice (COMSTOCK), it is said: " The statute, it is true, declares that each witness must sign on such request. But the manner and form in which the request must be made, and the evidence by which it must be proved, are not prescribed. We

apprehend it is clear that no precise form of words, addressed to each of the witnesses at the very time of attestation, is required."

In *Nelson* v. *McGiffert*, 3 Barb. Ch. 158, the Chancellor said: "Not only the witnesses, but the testator himself, must therefore have understood that they were witnessing the execution of the will, in conformity to his desire and wish; although he may not have said in terms, 'I request you and each of you to subscribe your names as witnesses to this my will.' If such a formal request was necessary to be proved, in all cases, and the witnesses were required to recollect the fact, so far as to be able to swear to it after any considerable lapse of time, not one will in ten would be adjudged to be valid."

The case of *Hayes* v. *West*, 37 Ind. 21, is much relied upon by counsel for appellant, but we do not think that case goes to the point involved here. There, the real question in dispute was, whether there had been any execution of the will. The will purported to have been executed by the testator in Cincinnati, Ohio, away from the residence of the testator, and to have been attested and signed by three witnesses. All three of the attesting witnesses were examined, each of whom testified to the acknowledgment of the testator of the execution of the will by him, and that they signed it as witnesses, at his request and in his presence. But it was claimed that two of such witnesses had been successfully impeached. It was held that the one witness who was unimpeached having testified that he and the other attesting witness had subscribed the will as such, in the presence of the testator, and at his request, there was no necessity for calling the other witnesses, as he fully established the due execution of the will. It was not pretended that the attesting witness had attested and signed the will at the request of any person other than the testator. That case, therefore, cannot be relied upon as an authority for the point in dispute here.

The case of *Reed* v. *Watson*, 27 Ind. 443, is also relied upon. In that case, one of the witnesses signed the will at the request of the testator, before it was signed by the testator, who took it away with him, and afterward he signed the will, and then

another witness signed it at his request. It was held that the will was not properly executed, because it was necessary that the testator should have signed the will before it was attested by the witnesses. The testator must sign his name in the presence of the witnesses, but if this is not done, he must acknowledge his signature in their presence. This was not done in that case, and for that reason the will was held to be invalid.

Counsel for appellant draw a distinction, which is recognized by the old authorities, between attesting and signing the will. But the force of this distinction has been greatly weakened by the recent decisions of this court, where it was held that there was nothing in the statute which requires that the testator shall make known to the subscribing witnesses that the paper which they are to subscribe is a will. *Brown* v. *McAlister,* 34 Ind. 375; *Turner* v. *Cook,* 36 Ind. 129.

It is further insisted by counsel for appellant, that the instruction was erroneous, for the reason that the court usurped the functions of the jury by assuming the existence of certain facts. We do not think the objection is well founded. The court but stated a hypothetical case. It amounted to this, that if the jury found certain facts to exist, then the law arising thereon was as stated. *Barker* v. *The State, ante,* p. 163.

It is stated, 1 Redf. Wills, 244, 246, that it is not necessary that the testator should actually see the witnesses attest and sign the will, but that it was sufficient if it was done under such circumstances that he might have seen the witnesses attest and sign the will.

We think the second instruction given was correct, and the one asked by appellant was incorrect.

The sixth instruction is as follows: "A person competent to make a will may disinherit all of his children, and bestow all of his property upon strangers; or he may give his property to one or more of his children, and disinherit the others; or he may bequeath more of his property to some than to others of his children, and the motive for so doing cannot be questioned, and the hardships of the case can have no other weight

further than a circumstance tending, with other testimony, to show the insanity of the testator. The weight to be given to the fact that the testator has made an unnatural disposition of his property must be determined from a consideration of all the circumstances in each case. If a father disinherits all of his children, who are in needy circumstances, and bestows all of his property upon such of his children as are in affluent circumstances, the act appears harder and more unnatural than it does where the parent disposes of his property and bestows it upon his children who are in need, to the exclusion of his children who have been more successful in accumulating wealth. In determining the true character of the will in question, in reference to the parties to this suit, it will be proper for you to consider the pecuniary circumstances of the respective parties at the time the will was made. If, upon a full consideration of all the circumstances connected with the making of this will, you find that the testator has made a rational and reasonable disposition of his property, no presumption of unsoundness of mind can be drawn from the fact that he bestowed a much larger share of his property upon the defendants than upon the plaintiff. It is proper for the jury to consider, in connection with this part of the case, any declaration which may have been made by the testator prior to the making of the will, in regard to the disposition he intended to make of his property. And if it shall be found that when he was in good health, and free from undue influences, he declared his intention to dispose of his property in the same manner it is disposed of by this will, it is an important fact to be considered in determining the validity of this will."

The sixth should be considered in connection with the seventh, eighth, ninth, tenth, eleventh, twelfth, and thirteenth instructions, which are as follows:

"7. Notwithstanding the law presumes that every person is of sound mind until the contrary is proven, yet when unsoundness of mind has once been established, the presumption is that the state of unsoundness exists or continues until the contrary is shown. The material inquiry for the jury

should be in all cases, whether at the very time the will was executed the testator was of sound mind.   If the testator was of sound mind at the time he executed his will, it is immaterial what the condition of his mind was either before or after that time.

" 8.   While the law does not undertake to measure a person's intellect, and define the exact quantity of mind and memory which a testator shall possess to authorize him to make a valid will, yet it does require him to possess mind to know the extent and value of his property, the number and names of the persons who are the natural objects of his bounty, their deserts with reference to their conduct and treatment toward him, their capacity and necessity, and that he shall have sufficient active memory to retain all these facts in his mind long enough to have his will prepared and executed; if he has sufficient mind and memory to do this, the law holds that he has testamentary capacity; and even if this amount of mental capacity is somewhat obscured or clouded, still the will may be sustained.

" 9.   To enable a person to make a valid will, it is not requisite that he shall be in the full possession of his reasoning powers, and of an unimpaired memory.   Few, if any, persons are in the full possession of their reasoning faculties when enfeebled by age or prostrated by disease.   A large majority of wills are made when the testator is upon his deathbed, and when the mind and body are more or less affected by disease and suffering; nevertheless, a person prostrated by disease is capable of making a valid will, if at the time of its execution he has mind sufficient to know and understand the business in which he is engaged.

" 10.   In a proceeding to contest the will of a testator on account of the unsoundness of his mind at the time of its execution, all the law requires of the person questioning its validity is, to show the unsoundness of the testator's mind at that time. It is not incumbent upon him to show that the testator did not possess sufficient disposing memory to make a will.  When unsoundness of mind has been established, the burthen of

showing sufficient mind and memory when the will was executed rests with the defendants.

" 11. If, from disease or the effects of medicines administered to him, the mind or memory of the testator had become so impaired or clouded that he did not fully know or understand what he was doing when he executed it, he was, for all the purposes of this will, a person of unsound mind and incapable of making it.

" 12. Notwithstanding the testator, either from effects of the disease or from medicine administered, or from both combined, would, when left to himself, fall away into a state of stupor or sleep, yet, when fully aroused, he was capable of recollecting and remembering the extent and value of his property, the number and names of his children, his obligations to each one of them, the amount he had given them, and the wants and necessities of each of them, and the will was read over to him, or its contents made known to him, and executed by him when fully aroused from such state of stupor or sleep, and when in possession of the degree of mental capacity just stated, he was at the time capable of making a valid will.

" 13. An insane delusion exists when a person imagines that a certain state of facts exists which have no existence at all, except in the imagination of the party, and which false impression cannot be removed from such person's mind by any amount of reasoning and argument. A will which is the offspring, or is executed under the influence, of such a delusion would be invalid. If, however, the facts do really exist as is supposed, and the person is not deceived in regard to their existence, no delusion exists, and a will executed under such influence would be valid. If there is no deception, there is no delusion."

The first objection urged to the sixth instruction is, that it assumes the existence of the facts that are used by way of illustration, and that such facts were not shown to exist by the testimony. The court did not assume that the matters that were stated to illustrate the law had been proved on the trial.

It appears from the will that the testator devised all of his real estate, growing crops, and farming implements to his son Christopher and his daughter Rachael, and that his money was equally divided between them and his son Alfred, the contestant below and appellant here. It is obvious that an unequal division was made by the will. But there was evidence as to the advancements made by the testator to Alfred, sixteen years before the execution of the will, when he was about removing to the State of Missouri. There was also evidence tending to show that Alfred was worth more than the whole estate devised by the testator. The instruction was not impertinent, but had a bearing upon the case made by the evidence.

It is, in the second place, objected that the instruction was erroneous, for the reason that the court charged the jury that it was important for them to take into consideration the declarations of the testator as to his intention, in considering the validity of the will. It is conceded by counsel that the instruction would have been correct, in this particular, if the court had said, " in determining whether the testator was, at. the time of making the will, sane or insane." We are referred to *Hayes* v. *West,* 37 Ind. 21, where it was held that previous declarations were admissible upon the ' question of mental capacity, but not upon the question of undue influence. We are satisfied with the ruling in that case, but we do not think the jury could have been misled by the instruction in question. .As we have seen, three causes were assigned for setting aside the will:

1. Undue execution.
2. Insanity of the testator.
3. Undue influence.

The second instruction related to the execution of the will. The third, fourth, and fifth instructions are not in the record. The sixth, seventh, eighth, ninth, tenth, eleventh, twelfth, and thirteenth related to the question of soundness of mind. As will hereafter appear, the fourteenth, fifteenth, sixteenth, and

seventeenth instructions relate to the question of undue influ-
ence. We think, from the connection, the jury must have
understood the court as referring to the question of sanity
when he spoke of the validity of the will.

The principal objection to the eighth instruction is based
upon the last sentence, which reads, "And even though this
amount of mental capacity is somewhat obscured or clouded,
yet the will may be sustained."

In *Moore* v. *Moore*, 2 Bradford, 261, S. C., Redfield's
American Cases upon the Law of Wills, 182, it was held that
testamentary capacity is consistent, especially in very aged
persons, with a great degree of mental infirmity, and some
degree of mental perversion or aberration, at times, provided
there is satisfactory proof that the testator, at the time of the
execution of his will, really did comprehend its import and
scope, and was not under the control of any improper or undue
influence, or of any deception or delusion.

In *Morris* v. *Stokes*, 21 Ga. 552, S. C., Redf. Amer. Cases
upon the Law of Wills, 200, it was said :

"Respecting the sanity of the testator, the court charged
that, 'be the testator wise or unwise, yet he was capable of
willing his property unless totally deprived of reason.' It is
complained that the rule thus stated, as to the standard or
measure of testamentary capacity, is wrong. We are not pre-
pared to say that even this language is too strong. The Eng-
lish courts say upon this subject, 'Courts will not measure
the degree of understanding, and say that a weak man, pro-
vided he is out of the reach of a commission, may not give
as well as a wise man,' and case upon case can be cited which
go to the extent of deciding that unless the failure of under-
standing be quite total, reaching to the testator's forgetfulness
of his immediate family and property, he is not disqualified
from making a will. The weak have the same rights with the
prudent and strong-minded, to dispose of their property ; and
if imbecility, and not a total absence or perversion of mind,
should constitute inability to act, it is impossible to draw any

clear line of demarcation—one which would be practically available."

It is objected to the ninth instruction, that the court stated to the jury, as matter of law, a very doubtful statistical fact, that is to say, "that a large majority of wills are made when the testator is on his death-bed, and when the mind and body are more or less affected by disease and suffering." It is contended that the above language was well calculated to impress the minds of the jury with the conviction that the fact that the testator was in that condition, when the will in question was made, rather tended to sustain than invalidate the will. Such might have been the impression if the instruction had terminated with the language quoted, but the court added, "Nevertheless, a person prostrated by disease is capable of making a valid will, if at the time of its execution he has mind sufficient to know and understand the business in which he is engaged." We have no means of knowing whether the statement that a majority of wills are made when the testator is upon his death-bed is true as matter of fact, but we know, and the jury doubtless knew, from their experience and observation, that a large number of wills were made by testators when upon their death-beds, and as the court charged them that to render a will valid when executed under such circumstances, the testator must have mind to know and understand the business in which he was engaged, we do not think the use of the word "majority" misled the jury, to the prejudice of the appellant. Considering together all the instructions bearing upon the question of soundness of mind, we think they very correctly stated the law. There are matters which should have been omitted, but we do not think they injuriously affected appellant, or rendered the instructions erroneous.

The fourteenth, fifteenth, sixteenth, and seventeenth instructions relate to the question of undue influence, and will be presented and considered together, and they are as follows:

"14. The plaintiff has alleged that the execution of the will in controversy was procured by the undue influence of the defendants, exerted and exercised over the mind and memory

of the testator at the time of the execution of the will.   If the execution of this will was procured by such means, it is void.   The burthen of proving that its execution was thus procured is upon the plaintiff in this action.   In determining whether this will was procured to be executed by the undue influence of these defendants, or any of them, exercised over the mind of the testator, it must be borne in mind that those influences which arise from the social and family relations, from kind treatment, and faithful services, are not undue or unlawful.   The influence of the husband over the wife, or of the wife over the husband, of the parent over the children, and of the children over the parents, are legitimate influences. Such influences should always exist and be encouraged, should operate at all times and upon all subjects, and never should be confounded with positive dictation and control exercised over the mind of the testator.

" 15. Consequently, every influence brought to bear upon the mind and will of a testator to induce him to make a will of a certain description, and to bequeath his property to a particular person, is not undue influence which will vitiate a will.   One person has a right by fair persuasion and arguments to induce another person to make even a will in his behalf, and a will induced and executed under such influences will not be invalid.   To invalidate a will, the influence must be such as amounts to force and destroys the free agency of the testator.   This may be accomplished by persuasions, importunities, force, threats, or coercion of such character and degree that they can not be resisted.   The testator must be a free agent, by which is meant that he has the power to do or not to do a given act, if he has the will; consequently, neither advice, arguments, nor persuasions will vitiate a will if freely made, although such will might not have been made but for such advice and persuasion.   Upon the same principle, Christopher Bundy had a right to advise his father to make a will, and to make it in his own favor, and he had the right to use fair arguments and modest persuasions to induce him to make

.such a will. No influence is undue or unlawful which does not essentially interfere with the free agency of the testator.

" 16. No legal presumption of undue influence can arise from the fact that the testator was on his death-bed, and surrounded by these two defendants, who are principally benefited by the will, while the plaintiff was absent. It was the duty of both these defendants to be present and administer to the wants and comforts of their father during his last hours, and the fact that they were there is no reason that the will should be set aside. Before any presumption of undue influence can arise against these defendants, it must be shown that the will was the offspring of improper influences, and that these influences proceeded from these defendants. That the exercise of such an influence at that time would have been a fraud, can never be presumed, but must be proved.

" 17. I have informed you that no legal presumption of undue influence arises from the fact that the testator was prostrated by disease, and that these defendants who are principally benefited by the provisions of the will, were near him and were his principal attendants, and the plaintiff was absent, even if its provisions are deemed unnatural or harsh. But if the other testimony in the case indicates that the will was procured by undue influence on the part of some one, it is incumbent upon these defendants to remove any suspicions which may arise against them, and on failure to do so the jury may infer undue influence on their part, but they are not bound to indulge such a presumption."

The objection urged to the fourteenth instruction is, that it does not define the kind or degree of influence which is legitimate. It is argued that the court should have qualified the word influence by the use of the words " fair and reasonable." We think the fourteenth and fifteenth instructions, when taken together, conveyed to the minds of the jury the meaning that the influences which were described as legitimate, in the fourteenth instruction, were " fair and reasonable " influences. This is made to appear in two ways. In the last clause of the fourteenth instruction, the jury were told that the influences

which were legitimate " should never be confounded with posi-
tive dictation and control exercised over the mind of the tes-
tator." If the influences spoken of did not amount to positive
dictation and control, then they must have been "fair and
reasonable." In the fifteenth instruction, the jury were told
that a person had the right by fair persuasion and arguments
to induce another person to even make a will in his own
behalf.

The objection urged to the fifteenth instruction is, that the
jury understood therefrom that the only influences which
would invalidate a will must amount to force and destroy the
free agency of the testator. The language complained of is
explained and qualified by the very next sentence, wherein the
court says: " This may be accomplished by persuasions,
importunities, force, threats, or coercion, of such character and
degree that they can not be resisted."

It is contended by counsel for appellant that the sixteenth
instruction was erroneous, for the reason that the facts recited
in the first sentence of it did create a legal presumption of
undue influence against the appellees. We think the instruc-
tion was right. See the numerous cases relating to undue
influence, collected by Redfield in his American Cases upon the
Law of Wills.

The nineteenth instruction is as follows:

" In weighing the testimony of witnesses, the jury should
consider their capacity to understand the facts about which
they testify, their opportunity of knowing the mental condi-
tion of the testator at the time the will was executed, and
their integrity, bias, and interest in the event of the suit.
The opinion of witnesses who are not experts upon the sound-
ness or unsoundness of the mind of the testator is of value
only to the extent to which the facts to which they testify tend
to show soundness or unsoundness of mind. And the opinion
of medical witnesses who have never had any personal
acquaintance with the testator, but base their opinion upon a
supposed case put to them by counsel, is of but little value.
The testimony of the testator's neighbors, who have long been

acquainted with him and have had frequent intercourse with him, is more valuable and reliable than that of such experts."

In *Rush* v. *Megee*, 36 Ind. 69, this court very fully approved of an instruction in which this language was used: "The opinion of a witness, whose attention has been particularly called to the testator, who was familiarly acquainted with him, who had frequent opportunities of observing him and the operations of his mind, is entitled to greater weight than that of a witness of equal sagacity whose opportunities of forming an opinion were more limited. The facts upon which the opinions of such witnesses are based have been given you, and you should weigh the opinion expressed by the facts given. The opinions of subscribing witnesses to the will should also be considered. The opinions of medical men, scientific men, commonly called experts, are also to be weighed by you. You are to determine the weight properly to be attached to the opinion of such witnesses. You are to consider their experience, the extent of their study and practice in relation to such matters, the reasonableness or unreasonableness of the opinions they have expressed, and whatever of interest they may have or manifest in regard to the case. You should consider also whether the testimony of such witnesses is partisan in its character, warped, or biased by any leanings for or against any of the parties. You should consider the circumstances under which they testify ; and, in short, you should scan all the evidence closely, to the end that you may give to every part of it its proper weight, neither less nor more."

We do not find it necessary to decide whether the court below had the right to say to the jury, that the opinion of medical witnesses who have never had any personal acquaintance with the testator, but base their opinions upon a supposed case put to them by counsel, is of but little value, because we do not think the appellant was injured by such instruction, or has any right to complain of it. The only medical witness examined upon the trial, who was not personally acquainted with the testator, was Dr. C. L. Paynter, who was called by, and testified strongly in favor of, the appellees. If

the appellees were complaining of such instruction, a quite different question would be presented.

It was also assigned as a reason for a new trial, that the verdict was contrary to, and not supported by, the evidence.

We have carefully read and duly weighed all the evidence, and so far as the questions of the unsoundness of the mind of the testator, and undue influence on the part of the appellees, are concerned, we think the verdict was not only right, but imperatively required by the evidence. There was very little evidence tending to establish either unsoundness of mind or undue influence.

William R. McKnight, the draughtsman of the will and the executor under it, gave a very intelligent and succinct statement of the manner and the circumstances under which the will and the codicil were executed. There were four attesting witnesses, who gave, in substance, the same evidence. The evidence of Mr. McKnight was as follows:

" William N. Durbin came after me on Sunday morning before the old man Bundy died, and told me that the old man Bundy wanted me to come over and write his will; I took Willis Fatlock along with me; I said we would need a witness; when we got there Dr. Burge was there; the doctor said the old man was very bad off, but said he was sensible; I took a seat by the fire; sat there a few minutes, and then went to the old man's bed, and said, ' Uncle Christopher, how are you?' He said, ' Poorly.' He said, ' Billy, I want you to write my will; I want to tell you the state of my affairs.' The old man said he wanted to give Christopher the home place, and the other place to his daughter Rachael. ' I want to give Frank Bundy one dollar,' he said, earnestly; ' Frank is not Jim's child.' And he also talked about Wagoners; and Louis Wagoner one dollar, and to James' widow one dollar, to cut them off. I then began to write, and hurried to get through before the old man's fever came on. When I came to the personal property and money, I said, ' Uncle Christopher, what do you want to do with your money?' At first he did not answer; I asked him again, and he said, ' I expect that Alfred would

like to have my money, but I want to keep it myself, if I get well.' I then explained to him that, if he got well, what we were doing would amount to nothing; I then asked him if we should give his money to Alfred, to Rachael, or to Christopher, or shall we divide it equally? He said, 'Divide it equally;' I am not positive whether this conversation took place before I commenced to write the will, or during the time I was writing it; I finished it up, and read it to the old man, and he said it was all right; he then signed it, and Dr. Burge held the pen; the old man took hold of it and made his mark; I then asked the witnesses to sign it; they signed it at the table which was in the same room; he might have heard me ask the witnesses, and could have seen them put their names to the will; I asked him who he wanted to settle his business; he looked up and said, 'Billy, I always wanted you to do that;' after the will was signed, somebody mentioned that the old man wanted a provision made in the will about his tombstone; I thought it would be better to write it over, as in the one I had written I had left out some words, and did not want to interline it, and requested Dr. Burge to copy the one I had written and was signed, as he could write a better hand than I could, and I told him to put in the provision about the tombstone, as the old man had told me; and Dr. Burge copied the one I had written, and he put in the provision about the tombstone; Dr. Burge then read it to the old man, and he said, 'It is all right,' and signed it as he did the first one; I again requested the witnesses to sign it, which they did at the same table; I do not know that the old man heard me ask them to sign it; I think he was awake and could have heard me, and could have seen the witnesses sign their names to the will if he had looked; I do not know whether he was looking or not. When it was signed by the witnesses, I folded it up, put it in my pocket, and took it home with me. I went back to the old man's on Monday morning; I went to the old man's bed; he said he wanted to talk to me about his affairs; he said Vanmeter owed him five dollars, and Ner Cameron owed him some, and Rachael said she owed him

thirty dollars. The old man said, ' You are wrong;' and then he calculated the items, and found the amount was even thirty dollars; and Christopher said, ' I owe you twenty dollars.' The old man said he wanted Christopher to have the farming utensils. Rachael was there, and asked her father if she must return what he had given her; he said, ' No.' He then said, ' I intended the growing wheat to go with the land.' I told him in that conversation I thought that these provisions ought to be in the will, and that the growing crop would not go with the land unless it was put in. I did not have the will with me then. This is the substance of the conversation I had with the old man on Monday morning. I then went home, and returned that night and took the will with me; after I got there we sent for Dr. Burge to come and write a codicil to the old man's will; I asked the old man if he remembered the conversation I had with him in the morning. He said, ' Yes.' I repeated it to him, and told him I thought it ought to be added to the will. He said, ' All right.' When Dr. Burge came, I got him to write the codicil; after the codicil was written, the doctor read it over to the old man, and he said it was all right; the doctor then signed the old man's name, and the old man made his mark; I did not see him take hold of the pen, for some one stepped between me and him just at that time; it was then signed by the witnesses, at my request; the witnesses then signed it at the bureau which was in the same room, and where the old man could have seen them."

We think it plainly and unmistakably appears from the foregoing statement, that the subscribing witnesses attested and signed the will with the knowledge, consent, and procurement of the testator. There was nothing clandestine or secret about the matter. The testator gave his directions about his will, in the presence and hearing of all who were present in the room. It was written and read over to the testator in the presence and hearing of all who were in the room. The request of the scrivener to the witnesses was publicly made in the room, and in a tone of voice loud enough for the testator and all others in the room to hear. The witnesses subscribed their names

within six feet of the testator, and in full view of him. Besides, the will was executed twice on Sunday, and the codicil was talked over on Monday morning, and was added Monday. The witnesses having attested and signed the will twice, and the codicil once, greatly increases the probabilities that the testator was conscious of all that took place. He might have heard the request of the scrivener who was confessedly acting for and on behalf of the testator, and it will be presumed, in the absence of any showing to the contrary, that he did hear and assented thereto. He might have seen the witnesses when they attested and signed the will. This is sufficient, although, in fact, he did not see them. The facts proved very clearly bring the case within the rule laid down in *Gilbert* v. *Knox*, 52 N. Y. 125.

We think the case was correctly decided on its merits, and that no such error has intervened as would justify us in reversing the judgment.

The judgment is affirmed, with costs.