(Cuyahoga County Probate Court.)

In the Matter of the Estate of WILLIAM S. JONES, on Application to Probate Spoliated Will.

*Probate of spoliated will—What evidence admissible on application to probate spoliated will.*

---

WHITE, J.

This is an application by The Children's Aid Society, Mary H. Campbell and The Lake Side Hospital, legatees under the will of William S. Jones, to have probated and recorded in this court, the will of decedent, executed November 17, 1891, together with a codicil executed June 17, 1893. Both papers are presented and admitted in evidence. On profert thereof, the condition of mutilation manifest on both of these instruments, is such as to prevent their probate on the ordinary application and proof of wills, which can be produced in court in complete, full and ample form. A single glance at these papers puts it beyond doubt that the most essential part of their authentication, the signature of the testator, is wanting. These signatures once formally affixed, acknowledged and attested, have been removed from the paper upon which the will and codicil are written by being torn out and wholly expunged. The physical conditions and acts of destruction meet and satisfy the requirements of the statute, providing how wills may be revoked. "A will shall be revoked by the testator tearing, cancelling, obliterating, or destroying the same, with the intention of revoking it, by the testator himself, or by some person in his presence or by his direction, etc. Sec. 5952, Rev. Stat.

There can be no doubt therefore, that this instrument, on its face, is no longer such a testamentary document as can be sanctioned and probated as in ordinary wills. No such character is in fact claimed for it. It being presented then, in this imperfect and mutilated form, what is the attitude of the case presented, and the proof required, due to its manifest imperfection and incompleted and mutilated condition? Does any presumption arise upon the fact of its condition? If the will was intact, it would then devolve upon the proponents to make it appear to the court, by the testimony of the attesting witnesses, or otherwise, that it was duly executed, signed and attested by a person of full age, and of sound mind and mem-

ory. In that case the appearance and condition of the complete will, would have some evidential effect upon the court. In such case the law requires the paper-writing to be actually produced and presented to the court for judicial inspection. The purpose of the law is manifest. On the contrary, when presented and produced in the condition of this will, with the signature of the testator, once formally attached and appended in two places, torn out of the paper as though of set purpose and with deliberation and care, the fact of such condition itself, must have some bearing upon the evidence essential and sufficient to justify its probate.

The act of probate, however, may be passed upon a will, when it can not be produced in court in as full, ample and complete a manner as last wills and testaments, the originals of which can be actually produced in court. The statute confers "full power" and authority upon the probate court, to admit such wills to probate under certain conditions. This will is therefore presented as a "Spoliated Will." The law in Ohio distinguishes the proceedings for probating such a will, from those provided for probating an ordinary will. Plenary jurisdiction to probate such a will, depends upon the following requirements: 1st. The will must have been duly executed according to the provisions of the law upon the subject in force at the time of its execution. 2nd. That the will was not revoked at the death of the testator. 3rd. When such original will has been lost, spoliated or destroyed, subsequent to the death of the testator; or, 4th. After the testator has become incapable of making a will by reason of insanity. Besides the requisites of being so lost, spoliated or destroyed, the most marked and peculiar requirement is, that it was not revoked at the death of the testator. No affirmative proof of this fact is required in the case of an ordinary will. The reason of this provision is obvious. The absence of the will itself, in court, and the inability to produce it, unexplained raises the presumption that it was so revoked by the testator. That presumption must be overcome by the evidence. When such an application is made to probate such a will, the law designates the sources of the evidence, and prescribes the duty of the court, in respect theret. The witnesses to such will shall be called and examined, and such other witnesses, as any person interested in having such will admitted to probate, may desire, shall be called and examined. Upon such proof, the court must be satisfied before establishing such will by the order of probate. This is a plain statement of some of the statutory pre-requisites to the order of probate.

It is asserted in this case that the degree, character and certitude of the evidence necessary to be produced by the proponents, is clearly indicated in the language employed in the statute regulating the procedure or probating a spoliated, as contra-distinguished from an ordinary will. The court must be "satisfied" of the existence of every one of these material conditions in the premises. Evidently this expression means satisfied as a judge, or "judicially satisfied." It does not mean that the evidence shall remove all doubts. In civil causes to be judicially satisfied of the existence of a fact, or the truth of a propositions, is the result of the weighing and balancing of evidence. The effect of a fair preponderance of the evidence must be to cause the mind and judgment to rest content with a certain conclusion, while there may still linger remnants of doubts unremoved; yet, the mind, after fairly considering all the evidence, must rest quiescent and satisfied with its conclusion, as being the best supported by the overbalancing weight of the evidence. To be in this frame of mind and condition of judgment, is to be judicially satisfied, or judicially convinced, which is the same thing. But to produce such judicial satisfaction of the existence of a fact or the truth of a proposition of law, the

·quality and quantity of the evidence necessarily depends upon the nature of the facts or proposition to be established or maintained.

·It is incumbent upon the proponents to adduce such legitimate and proper evidence as to fairly to convince the court of the non-revocation of this will and codicil. The evidence must necessarily therefore be so clear and convincing as to overcome the inference of revocation from the appearance and condition of the will itself, when taken in connection with the fact, not controverted, that the testator himself so removed his signature and left it in its present state of mutilation. The court is bound to consider, the spirit, as well as the letter of the law, which directs that only such witnesses shall be heard as the persons who desire the probating of the will may summon. It would violate that spirit of favor in which the court is admonished by this statutory rule, to treat this case, to raise any captious or extreme measure or criterion of evidence, or to attempt to counter-balance its due and just effect, by interposing the barrier of questionable presumptions of law or fact. There are, however, some settled principles of law, in the light of which all the evidence must be considered. The right to make a will is not a natural right, but secured to a person by positive law. It is treated, however, as a sacred and important right, and its fullest and freest exercise is guaranteed. Titles to property are held subject to this right of testamentary disposition. This is fundamental doctrine. It is no less fundamental rule of law that the testator shall enjoy the fullest and freest right to modify, change, anul, and revoke his will at any time during its ambulatory period. This right of control and the ambulatory character of the modern will, is one of its chief characteristics, as a dispositive instrument. The testamentary act is inchoate until ·the death of the testator. If, as claimed, the ability to revoke his will, must be commensurate with his ability to make it, it is also true that his right to revoke it correlates with his right to make it in the first instance. No legatee nor devisee secures any vested right in the property of the testator, during the ambulatory period of the will. It is not too much to say that the legatees under this will have no vested rights in the estate of William S. Jones, unless his right and ability to control and revoke this will, was lost or destroyed at least at the time he dealt with it, and his act in that regard was void or voidable. This is not an extreme statement. Indeed, the proponents do not deny this attitude of the case, nor do they disclaim the burden of satisfying the court that the testator had so lost his right and ability to treat his deliberate and solemn testamentary disposition.

It is not my purpose to attempt to recite with minute particularity all the facts which may be considered proven. It appears to me proper to set out, somewhat fully, the facts constituting the conduct and dealings ·of the testator, in regard to his testamentary transactions.

The court will begin with the earliest of these dispositions.

William S. Jones executed a will on the 17th day of March, A. D. 1891.

In substance, by the terms of this will, he bequeathed to the Children's Aid Society, the sum of $5,000, the same to be credited to, and treat-·ed as a memorial gift for his father John Jones, who died in 1873. To the Invalid's Home, $5,000, the same to be credited to his mother, Mary A. Jones, who was then living, and who survived him. To the trustees of the Lake Side Hospital, $5,000, to be placed on the books of said hospital and ·credited to the joint names of his father and mother. To his sister, Mary E. Hamilton, $5,000. To Walter J. Hamilton, his nephew and to Florence Hamilton, his niece, each $2,500. To Edwin T. Hamilton, the .amount owing by him to the testator. To Mary Halliwell Campbell, whom .he named as his "friend", $5,000. To his cousin, Mary E. Betts, the sum

of $1,000. To his cousin, Wm. M. Morse, $200. After the payment of said legacies all the rest of his estate he bequeathed to his brother Orville L. Jones. Should any of the above bequests not be paid or accepted, then any such sums should be paid to Mrs. Campbell. This will was drawn by himself. It was signed in the presence of C. D. Foote and O. C. Nelson. It is important in view of subsequent events, to remember how he dealt with this will. At some time after its execution—at what time is uncertain—he revoked it, not by the subsequent will, nor by a codicil, but by tearing out from the place where it was written, his signature, and not otherwise mutilating or injuring the will.

His next testamentary disposition is the will propounded for probate. It was also a holograph will, carefully, plainly and skilfully drawn, apparently without the advise or aid of counsel. It is dated November 17, 1891, just eight months after the first. By the terms of this will, after providing for the payment of his debts, by the first bequest he gives Mrs. Campbell, calling her "his dear friend," the sum of $10,000. To the Children's Aid Society, the sum of $5,000, the same to be a donation in the names of his father and mother. To the Lake Side Hospital, he gives $5,000, to be treated also as a gift from his father and mother. To the First M. E. Church of Cleveland, for the benefit of the S. S., $1,000, with the request that it be accepted and credited as a donation from his mother. Then to the Invalid's Home, $5,000, to be credited to and held in the name of his father and mother. To his cousin Mary E. Betts, $1,000. To his cousin Wm. E. Morse the sum owing to the testator from the father of said legatee and $50 in addition. To his brother Orville L. $10,000, and the residue to Orville L. and his sister Mary E. Hamilton, two-thirds to the former, and one-third to the latter. In the event of the failure or non-acceptance of the specific legacies, the sum so refused or not paid, are given to Mrs. Campbell. Orville L. Jones is made executor of both said wills, with a request that no bond should be required of him as such executor. This will is attested by the same witnesses as the former. From all that appears this will remained in the exclusive possession of the testator. It was deposited with other personal papers in the vault of the Citizens' Savings & Loan Association, of which the testator was president. He was a man of careful, methodical habits; not communicative about his own private concerns, and the evidence makes no disclosure of the fact that he ever mentioned his will to his brother, sister or mother. He made no statement to the employes in the bank who attested all his wills, although on familiar terms with them.

His next testamentary act, was the codicil to this will, executed June 17, 1893. He gives to Mrs. Campbell, called her "his fiancee," his diamond stud, diamond ring, ruby pin, diamond collar-button, and gold locket, and directed his executors or legal representatives, in addition to his former bequest, to pay her $5,000, if she be living, otherwise this and former bequest to be and remain a part of his estate. He states that the debt owing from Mr. Morse having been paid, he directs the $50.00 legacy to Wm. M. Morse to stand. He bequeaths to Edwin T. Hamilton, the amount owing from him. In all other respects he confirms the will of Nov. 17, 1891.

The court has thus stated the substance of Mr. Jones' testamentary acts, that a view may be had of his manifest purposes and intentions, the changes and modifications in the course of such purposes; the manifest desire by the repeated testamentary efforts, to transmit by will; no less to discover by the internal evidence of these instruments, the ability, intelligence, care and prudence of the testator in controlling and conserving his estate and property.

The will of November 17, A.D. 1891, with the change and confirmation wrought by the codicil of June 17, 1893, stood as the outward and ostensible expression of his testamentary purposes up to the 15th day of November, A. D. 1893. His statements and declarations touching these acts, which would have been legal evidence of his intentions, are very meagre, considering the relations he sustained to others, there was a somewhat remarkable reticence manifested by him about these transactions. I am not mindful of the testimony of one of the proponents, as to his statements about the codicil. All things considered, his infrequent and slight reference to the subject, manifests a disposition to keep the knowledge and control of these matters within his own grasp. The repeated purpose to establish the public benefactions evidenced by these wills, should not be overlooked. The delicate and beautiful filial intention to found a fitting memorial for his father and mother in these bequests, is another feature of the wills to be observed. While it is the expression of a deliberate, matured, and persistent object, and one so ripened as not to be readily relinquished, it is no less the expression of a strong family bias and a feeling of reverence for the memory of his dead father, and profound and abiding affection for his living mother. From beginning to end, there is not the slightest word or suggestion that these wills were not the product of his own free, untrammeled choice. The changes in them were not caused by any persuasion or influence of others, of any sort, due or undue. With a single marked exception, outside of the public charities, the objects of his bounty were his own family and next of kin. The changes made are not so radical or unusual as to evince vaccilation or uncertainty of purpose. Judging from the known character of Mr. Jones, the situation of his estate, the sources from which it was largely derived, his relations to these who were the objects of his bounty, by natural or other ties, it must be admitted that his will appears reasonable and natural.

It is the first duty of the proponents to satisfy the court that the will and codicil were duly executed in the mode provided by law, and that the contents thereof are substantially proved. This point may be disposed of, with a single observation. The evidence of this proposition is clear and conclusive. As already stated, the will and codicil were both drawn by Mr. Jones. All the solemnities were duly observed. These documents are completely preserved, less their signatures, and there can be no doubt as to their terms, provisions and contents. Mr. Jones was of full age and of sound mind and memory when these testamentary papers were executed. There is no pretense or suggestion that in this matter he did not act with perfect freedom from restraint or influence of any sort.

It may be proper at this point to touch upon such of the personal qualities of the testator disclosed by the evidence and understood by all, as are eessential to be considered.

William S. Jones stood for many years before this community as a useful, upright and honorable man; and for honesty, integrity and purity of character, dying past middle life, left a stainless fame and memory. His life was eminently useful and faithful in public station or private relationship. He was wise, prudent and faithful in the discharge of any trust. He never sought publicity or notoriety, but rather shrank from it; and was adverse to all ostentation or display. For a man of his means, education and mental ability, he lived a remarkable quiet and unobstrusive life. If I mistake not, he was cautious and conservative in a remarkable degree. He did nothing on impulse. I should say that he was slow and conservative in adopting any course of action. He had a strong family instinct, and a commendable family pride. He was a very sensitive man —sensitive to public opinion and comment; exceedingly sensitive and care-

ful of any injury to his good name or the reputation of his family. I think in the management of ordinary affairs he was not lacking in a certain conservative firmness and decision of purpose; but in the broader conduct and interests of life, he was cautious even to timidity. In the early part of his life he had formed a matrimonial alliance which had proved very unhappy and unfortunate. No one can doubt that over such a sensitive soul as that of William Jones, the miserable history of that venture, would leave an abiding shadow. From this domestic and matrimonial unhappiness, he returned to his family and went to dwell with h.s mother, to whom, before and after, he was devotedyl attached. He was a successful business man. The acquisition faculity was strong in him, and he was wise, and prudent in making and using money. His industrious and quiet habits, his wisdom in financial matters and his undoubted integrity and faithfulness, opened the way for a successful career as a banker, and he was honored in the management as president of one of our strongest financial institutions in the success and prosperity of which he took unusual interest and pride. He had passed many years in the auditor's office of this county, and had executed several private trusts in the administration of estates, and was entirely familiar with the general features of the laws of descents and inheritance.

It becomes the duty of the court now, to consider the very evidence as to the relationship in which Mr. Jones stood as bearing upon his testamentary motives and purposes. In touching this part of the case, it becomes my duty, as it is my pleasure, "naught to exterminate nor set doubt ought in malice." The case, in regard to the field of inquiry, has been a very peculiar one. The conducts and motives of those who from the peculiar legal attitude of the case, could not become parties to defend and vindicate themselves, have been publicly and seriously criticised and impugned. While it is not the duty of the court to deviate from the strict line of the record to assail or defend any person involved in this remarkable controversy, yet, where aspersions are cast on persons for influencing the alleged action of this testator, in his relations and testamentary conduct, it is not stepping aside to comment upon the situation, in a temperate and reasonable fashion.

Mrs. Mary Hallowell Campbell, one of the proponents, became acquainted with Mr. Jones in this city in 1888. Their acquaintanceship, gradually ripened into mutual respect, friendship, and finally love. An engagement of marriage was contracted between them in September, 1889. From that time on until his death on the 29th day of November, A. D. 1893, according to the evidence, that engagement was pending, deferred, and never consummated. The fact and course of this relationship has an important bearing upon the probable motives which actuated the conduct of Mr. Jones, and his disposition and feeling and ability to act in regard to his will, when it was dealt with on the 15th day of November, 1893, and it becomes necessary therefore, to consider the salient facts of this relationship. Mrs. Campbell, when she found the acquaintance of Mr. Jones, was a woman of mature years. Behind her, also, was an unfortunate matrimonial history. She had been divorced from a former husband. In all charity it is the simple truth, according to this testimony, that reports and statements of acts and conduct on her part, compromising her and seriously damaging her reputation, had followed her here from the place of her former residence. It is also a fact that, whatever the truth of these reports or character of her conduct, while dwelling here, she had friends among reputable citizens, male and female. She is a woman of marked ability and force of character; possessing strong intellectual qualities and literary graces and gifts. She is possessed of a strong positive nature. She had ample means to take care of herself and minor daughter.

There can be no doubt, that when this alliance became known, it met with decided and determined opposition upon the part of the relatives of Mr. Jones. That opposition seems to have been continuous from the time these relatives became possessed of the knowledge of Mrs. Campbell's alleged career and reputation, and the fact of the engagement looking toward matrimony wtih the testator. Into the merits of this opposition and controversy, it is no part of my purpose to enter. It is much easier, pleasanter, and more in accord with right reason and the natural probabilities of the case, to attribute to these relatives in it all, good, rather than bad motives. It may have been the over-zealous and unwise anxiety of an elder sister for a brother. He had made one mistake already. Possibly it may have been unjust. To say from all he evidence, however, that it was actuated wholly or in any appreciable degree, by mercenary motive to save the estate, without reference to the family and personal reputation of the testator, would, in my opinion, be unfair and unjust.

The all important inquiry is, how did it affect the mind and disposition of William S. Jones?

It must be conceded, I think, that the feelings and purposes of the testator, toward Mrs. Campbell, were sincere and honorable. I do not say that these purposes and feelings were not reciprocated in the same spirit. Out of hundreds of letters which passed between them, some thirty odd have been put in evidence. These were written between August and October, 1893. They all breathe the spirit of genuine love, and contain no hint or suggestion to detract from the purity and constancy of that sentiment. I must take it, that these letters reveal the truth. They disclose the secret thoughts passing from heart to heart. Furthermore there were substantial tokens of this unfeigned affection passing between them. Costly and appropriate gifts of jewelry were abundant. Further evidences of this regard, of an unusually generous nature, to the value of $20,000 at least, in stocks and money, were lavished hy him upon Mrs. Campbell. And yet, the most remarkable fact is that this ardent and unabated love never reached fruition in marriage. Why was this true? What hindered the culmination of the all important event? The reasonable answer to these questions, in my judgment, has a most important bearing upon the conduct of the testator. These persons were of mature age and experience. They were possessed of ample means. They were independent and free form incumbering impediments. According to the evidence, certainly twice, the time for this marriage was fixed. Two houses and lots were purchased in Cleveland for a home at an outlay of ten thousand dollars and upwards. Even details of furnishings and arrangement of rooms, was the subject of mutual discussion. The time came, and went, the places were sold, and the marriage deferred. Upon the cause of this remarkable "deferring of hope" some light is thrown by a couple of the letters in evidence. In a lengthy letter addressed to Mrs. Campbell in London, dated July 20, 1891, after speaking of the purchase of one of those places at an expense of $13,000, Mr. Jones says: I think you will be delighted with the place. Don't 'see how you could object to it. I cannot get possession before Oct. 1. It will take a few weeks to put it in order. I have not said anything to mother of our contemplated marriage, neither have I mentioned your name, for the reason that I did not want to brook the appeals that would be made to persuade me to postpone. The house is large enough to furnish rooms for her and maid," etc. And again * * * I have concluded that we ought to be married this fall. If it was not for mother's feelings in the matter there would be no hesitation about it; I love you and believe we could be happy together—if I thought otherwise I would court death rather than marriage. My days are neces-

sarily few, and I'm not strong physically, and of course my mental condition is in sympathy with my physical. My condition is partly due to our mutual relationship, and the pressure that has been brought to be are to forestall its consummation. I have been a slave to others' influence and controlled by them until I'm almost prostrated. Without strength of character to assist my independence, I have permitted you to reach a like condition. I have not thought it best to get married clandestinely, but married here or elsewhere, but knowledge of the same to my mother ought to be given in advance, as the shock to her might be disastrous."

As late as August 12, 1893, he had said nothing to his mother about his engagement. He writes to Mrs. Campbell on that date, saying: I shall keep for the present our affair from her. I don't think she knows anything about it"  *  *  *.

The following from Mrs. Campbell in strong language, evidences this remarkable indecision of Mr. Jones. The letter is dated from Switzerland, July 9, 1891. You imagine that your family would make me unhappy. Now, cast all such notions from your thoughts. I will be happy with you and will always be considerate of your family, either in not regarding their feelings, or doing what your judgment dictates, but I must be plain with you in this matter. I think you have done me an injustice with them, and caused me unwillingly many sad hours, by not exercising that will power that every gentleman, honorably engaged to a lady, should display. It was only necessary for you to show to your family that you were a man of independence, to have caused them to respect me, but that has nothing to do with our case, and I regret expressing myself as believing for a moment that you could dishonor my love for you by being unfaithful in our engagement, to be married this fall. I suggested in my letter yesterday that we be married on my arrival in New York. If you think that would not be well, I am willing to accept your judgment, but as I said in the candor of my heart, I would not return to America if you had the slightest intention of not being married this fall. I would certainly feel that the battle for love was lost."

The testimony of Mrs. Campbell is that Mr. Jones had full knowledge of all the stories and reported facts damaging her reputation,; that he had sifted them all, and so far as his judgment and feelings were concerned, they had ceased to have any prejudicial effect. It is the claim of the proponents that his ardent love for her was never abated, and his honorable purposes never lost their early strength. It is in evidence that the early autumn of 1893 was the last definite time fixed for the marriage. That while the event passed by this fixed appointment for the second time, it was not indefinitely postponed, but the engagement was to be carried out in January, 1894. That she offered to release him. That under the most solemn circumstances, and with protestations of undying love, he begged her not to leave him, and that he would end his life if he broke the engagement. That he would throw up the presidency of the bank and go to Europe and marry her. The reason, and only reason, given for this extraordinary measure; this abandonment of his life work and record, fleeing from his official position and leaving his mother, is the fact of the unpleasant surroundings that his sister and her family had caused him, and made his life so miserable.

Before proceeding with this history further, it is my purpose to state as fairly and concisely as I can the claims made by the proponents upon the law of the case, bearing upon the action and intention of the testator, and the effects thereof, when he removed his signature from his will.

The following is a brief statement of the points, ably and amply contended for by the proponents:

1.   The word insanity, as used by our statute, in sec. 5944, means any mental infirmity that produces testamentary incapacity. The word is not used in a technical and special, but in a generic and general sense.

2.   The capacity requisite to prove a will, is the capacity requisite to make a will; an insane testator cannot revoke his will.   There is a clear distinction between intelligence enough to destroy and capacity to revoke. Our statute recognizes this distinction, and adopts the capacity to make as the capacity to revoke.   The destruction of a will does not revoke it, unless done animo revocandi.

Briefly the claim upon the facts to which these propositions are applicable, is as follows:

The testator was incapacitated; as shown:

1.   By the direct evidence of his physical and mental condition, and

2.   By the utter improbability that he could have rationally intended to undo that which so well reflected his character, his sympathies, and his life-long purposes.

Counsel have appeared and exhaustively and ably contended against these positions.   I shall not attempt any exact summary of the points in opposition.   A very partial and imperfect statement might be made as follows:

1.   The meaning of testamentary incapacity due to insanity, as established by the settled current of authorities, always involves actual unsoundness of mind, and not mere mental weakness.

2.   The presence of the intention to revoke a will may be inferred from the character of the act of the testator.

3.   Capacity to revoke does not necessarily require so high a degree of mental strength as to make a will.

4.   The facts given in evidence fall far short of showing the testator incapable of making a will, when he revoked his will, and determined upon intestacy.

5.   By the correct meaning and interpretation of our statute, a will cannot be "spoliated" by the testator himself, however insane.   No provision is made for the probating of a will so spoliated, lost or destroyed. If this will was not revoked by what the testator did on the 14th and 15th days of November, A. D. 1893 in regard to it, the court must be satisfied from a fair consideration of the evidence:

1.   That he was not mentally capable of forming the intention to revoke it.

It must be conceded that this intention required by our statute, to accompany and prompt the act of mutilation or destruction, to work a revocation, must be testamentary in its quality.   It implies a free and rational animus revocandi on the part of the testator.   But if the will be actually torn, cancelled, obliterated or destroyed, by the testator, a presumption arises that the will, under such circumstances, was intentionally revoked by the testator, while he lived and was competent to revoke, and this persumption must be overcome by proper and competent evidences.   (Schouler on Wills, sec. 385.)

In the case, 1 Adams 74, in the English Ecclesiastical probate decisions, cited by learned counsel for the proponents, Sir John Nicholl, an acknowledged authority in testamentary law, uses the following language: "Questions of revocation are mere questions of intention—all which rests with the court in respect of them.   If a testator tear off, or efface his seal and signature, at the end of the will, the court will infer intention to revoke the whole will; this being the ordinary mode of performing that operation."

The proposition that a testator who is insane cannot, while so insane,

form and possess the essential intention to revoke his will, seems too plain for serious controversy. Whatever a testator who has thus been impeached as insane may do in regard to the destruction or cancellation of his will, the presumption of intention to revoke does not follow. In such cases the burden would be on the party claiming revocation, to prove a lucid interval. (Spriggs v. Spriggs, L. R. 1 Prob. and Divorce Div. 608; Thornton on Lost Wills, sec. 20). Where rational action is called in question the presumption of sanity always exists.

I am aware of the practice in courts probating wills, where the right of testation by statute is founded upon the existence of "sound mind and memory," to ask the attesting witnesses affirmatively, if the testator was of such sound mind and memory. While this is the practice, it seems to me such evidence merely reinforces the presumption of sanity which in every case obtains.

There has been much discussion in this case as to the nature and extent of the insanity necessary to destroy testamentary capacity; ard whether the testamentary intention to revoke is equivalent to testamentary capacity to make the will. While there are divers general definitions of testamentary capacity in the books, all agree that the strength, extent and character of capacity required in a given case, must depend on the character of the testamentary transaction. Authorities need not be multiplied on this proposition. A learned author has well said: "The vital question in any such case should be whether upon the evidence the particular instrument propounded for probate was or was not, under all the circumsatnoes, the real testamentary disposition of a mind neither deranged in producing it nor operating under stress of error, fraud, or undue influence,. And to decide this question properly requires a careful view of the particular case in all its bearings, without too rigid an adherence to any general maxims of capacity." Schouler on Wills, sec. 72. With this caution I shall call attention to the following authorities as a fair definition of the general term "testamentary capacity," and show how the same is modified as applied to special cases. "The law does not undertake to test a person's intelligence, nor define the exact quality of mind and memory which a testator must possess, yet it does require him to be capable of knowing the extent and value of his property, the number and names of the persons who are the natural objects of his bounty; their deserts in reference to their conduct and treatment of him, their condition and necessities, and be capable of retaining all these facts in his memory long enough to have his will prepared and executed. And if this amount of mental capacity is somewhat obscure or clouded, still the will may be sustained. Bunday v. McKnight, 48 Ind. 502. The mind of the testator may be broken, impaired, and shattered by disease, as is often the case with those who reach advanced age; yet, if he comprehend the act he is performing, and have strength of mind to form a fixed intention, and summon his scattered and enfeebled thoughts so as to enable him to execute that intention, he is not incapacitated to make a will. Stackhouse v. Horton 15 N. J. Eq. 202. Great intellectual and physical weakness accompanied by a partial failure of mind and memory, caused by paralysis, is said not to be in itself as sufficient indication of testamentary incapacity. Hall v. Dougherty, 5 Del. 435. Although the law does not demand a high degree of intelligence, yet it is necessary that the testator fully understand what he is doing. Barnhardt v. Smith, 86 N. C. 473. The same degree of mental capacity is not required to dispose of a small estate as of a large and complicated estate; nor to make a will simple in its provisions, as to make out a complicated scheme of disposition. 1 Demorest 503.

Referring to the exercise of jurisdiction to probate, where the will may be contested, learned judges have said: "While it is true that it is not the duty of the court to strain after probate, nor in any case to grant it where grave doubts remain unremoved, and great difficulties oppose themselves to so doing, neither is it the duty of the court to strain against probate, and impeach the will merely because it is made in old age or upon the sick bed, after the mind has lost a portion of its former vigor and has become weakened by age or disease." 25 N. Y. 5; 75 Ill. 260.

In the judgment of the court, these are some of the recognized rules of law, to be applied as tests of testamentary capacity.

There are different degrees of mental impairment as related to testamentary capacity. Insanity is a general and not a specific term. The best authors on legal medicines are disposed to confine insanity to that degree and character of mental unsoundness due to organic or functional disease of the brain or nerve centers. In its legal aspects, insanity may be said to be a marked departure of the individual in his modes of thought, states of feeling, course of action, habits and tastes, from his manifestations in this regard when in normal health. Hence the comparison of the individual with himself, affords a safe source of evidence.

There are various types of insanity, and while their classification is not always satisfactory, yet the symptoms growing out of organic disease or injury, as distinguished from functional derangement, is quite clearly defined. Delirium is considered one of these specific types.

Delirium of disease is a form of mental aberration incident to fevers, and sometimes to the last stages of chronic disease. It occurs in most severe febrile diseases, and is a common sequence of severe accidents and surgical operations. It is mostly of a subjective character maintained by the inward activity of the mind rather than by outward impressions. (Schouler on Wills, sec. 121; Mann's Med. Jur. of Ins., p. 86.) As a form of mental aberration it is distinguished from general or habitual insanity, in this, that once it is proved to be present, there is no presumption that it will continue. In cases of permanent proper insanity the proof of a lucid interval is matter of extreme difficulty, for this among other reasons, namely, that the patient so affected is not infrequently rational to all outward appearances, without any real abatement of his malady; so that in truth and susbtance, he is just as insane in his apparently rational moments as in his visible raving fits. But the apparently rational intervals of persons merely delirious for the most part are really such. Delirium is a fluctuating state of the mind created by temporary excitement, in the absence of which, to be ascertained by the appearance of the patient, the patient is most commonly really sane. Hence, a lucid interval is more easily established in cases of delirium than in habitual insanity. Brogden v. Brown, 2 Addams Ecc., 445.

Some of these considerations seem to me applicable to the case at bar. It has already been said, however, that it is exceedingly unsafe to attempt the use of general theories or tests on these points, in deciding a case. The facts and circumstances of each case impartially and fairly considered; keeping in view the quality of the very act itself, and its legitimate results to find whether it is reasonable and consistent; this is the course of inquiry advocated by the most authoritative adjudcated cases.

William S. Jones left the bank and substantially ceased to attend to business about the 18th day of October, A. D. 1893. He soon after took to his bed, from which he never arose, and died on the 29th of the following November. In the events between these dates, facts are centered of the utmost gravity and importance in determining the validity of his act

in destroying his will. The culminating point of inquiry is the quality, character, force and effect of this transaction itself. During his whole life up to about the 28th of October, in the middle of this sickness, no one had ever suspected him of failing in mental strength and soundness. His uncle, Mr. Mason, who nursed him, did say that ten years previously he had delirium, following fever; the character of that sickness being similar to his last, but not so severe. None presumed to call that an evidence of his mental unsoundness. He had long since recovered. He possessed, in a remarkable degree, coolness of temperament and mental clearness. He was wise, moderate, considerate and well poised. He was an intelligent man; not broadly read nor highly cultured, perhaps. But he exhibited in his mental habits that power of concentration, steadiness, forethought and tenacity of purpose in his business career, which fitted him for his peculiar duties as a banker. He had been trained in the exercise of large trusts and responsibilities, public and private. He was familiar with all forms of business, and measurably with the practical rules of law applicable to all ordinary affairs. He had never manifested any disposition to ignore or become regardless of his duties toward others —or their rights growing out of any relation whatever. In an emphatic sense, he was a sane man, intellectually and morally. He appears to have become very sick soon after taking to his bed. According to Dr. H. J. Herrick, his physician, "his disease rapidly developed into gastro-intestinal difficulty involving the stomach, pancreas and bowels, and was attended with nausea and pain in the region of the stomach, and a good deal of mental depression, mental anxiety, at that time, headache and lassitude." Mrs. Campbell was then in New York. On the 16th day of October he went to his place of business and wrote her a letter. It contained no hint of despondency, but was in a hopeful vein touching his own condition, and conveyed the same expressions of regard as in many that preceded it. His communications with her did not cease. He requested his cousin, Orville Mason, with whom he was intimate, to correspond with her for him and keep her posted as to his condition, making the most favorable reports possible. Mr. Mason also visited New York city soon after Mr. Jones' sickness, and he was charged by the latter to call on Mrs. Campbell and convey an expression of his continued love and affection, and learn how she was. Mr. Mason did so, and returned verbal greetings with a letter from her. The witnesses called to testify of Mr. Jones' condition during his sickness were all in close attendance upon him, and must be said to have had a fair opportunity to observe him. It is true, however, that they were not all the persons who had the means to know of his condition. It must be said that these witnesses evinced no remarkable bias or want of candor. Some of them are near relatives, and seem to have participated in the feeling engendered in the family of Mr. Jones growing out of his relations to Mrs. Campbell, but I believe them to be honest, reputable people, and desire only the truth be established. There was a gradual progress for the worse in the disease of the testator. There might have been some days when his symptoms were lightly improved. Much of the time his temperature was high, ranging from 101 to 104, and his pulse running sometimes to 95 degrees.

It would be unpardonable and is unnecessary to follow the course of his condition from day to day. His most constant nurse, Mr. S. A. Mason, kept a diary or record of some facts of his condition, treatment, and what he said and did. His expressions of mental aberration seem to have been carefully preserved. I make reference to this fact, not for the purpose of unfavorable inference. It is but natural that those facts would be noted and recorded, and not the ordinary and unusual con-

versations and manifestations.  His mental manifestations denoting confusion or derangement, may be characterized by a simple statement of their tenor.  On October 28th he became a little flighty.  Thence forward his aberrent signs were as follows:  He said he must get up and go to the bank.  The medicine was too strong and was eating his stomach up.  Nov. 1st he said to Mr. Mason: "Uncle Alex., you are going to nail me up in a box and put me in the ground." Again: "I have got to go to New York, I can't stay here longer." Twice he imagined he saw a cat in the room, and requested his nurse to take it out.  He thought he saw a boy under the lounge, and requested him taken out and sent home; again, he saw sheep in the room and wanted them driven out.  When the appropriate motions and movements were made to remove these objects, however slight, he seemed appeased and satisfied.  He expressed himself as believing that there was a conspiracy to take him away, to at least two different people.  Once his brother, Orville L. Jones, and when, at Mr. Jones' request, Orville sat down by the bed, he was satisfied and went to sleep.  He thought he had taken a "horse-back ride" once, which had helped him.  He was too sick to rise from his bed.  The first and only allusion to his estate, or its disposition, until November 14th, was made on the 11th of November, 1893, when he told his nurse, Mr. Mason, that "he had provided well for Orville, and Mary Betts, his cousin, and you—" meaning the nurse.  He asked Mr. Mason, on the 13th of November, "If any one would offer you $5,000, would you leave me?" Miss Emily L. Watkins, a lady who nursed him a part of the time, to relieve Mr. Mason, testified that at one time (she being a Sunday school teacher,) Mr. Jones asked her, "If in teaching she put Jesus before John." He told her to keep the outside door of an adjoining door shut, as there were sneak thieves around.  He said once to Mason, "Guard that door; they are coming!" when no person was approaching.  Some of the times when he would make these remarks, he would look wild and seem strange.

I have now stated substantially all the signs of mental disturbance in the way of talks, testified to by the witnesses.  Orville L. Jones, who is an honest, reliable and trustworthy gentleman, is the only brother of William S. Jones.  He was on terms of brotherly intimacy with him, so far as disclosed by the evidence.  O. L. Jones was called as a witness for the proponents.  He was candid and frank in his testimony, according to my opinion.  He has a difficulty which makes his sense of hearing obtuse, and the testator had some trouble to make him hear, and Orville was obliged to get close down to his side in conversation, which made talking between them difficult.  On the 14th day of November, while Orville and his brother were alone, Mr. Jones called him to his bedside, and requested him to go down to the bank (The Citizens' Savings and Loan Association) and get a pocket-book or wallet with a key attachment, and bring it to him.  Orville went at once, but could not get the pocket-book because of some obstruction in getting into the vault of the bank at that time.  It does not appear whether he reported the failure to get the pocket-book to the testator or not.  Nothing was said by Mr. Jones as to his purpose in wishing to obtain the pocket-book.  On the next day, November 15, Orville again visited the bank to get the pocket-book, found the one with a "key attachment," as described, and carried it to his brother—handed it to him, and immediately stepped out into an adjoining room; because, as the witness says, "he did not wish to pry into the private affairs of his brother." His brother very soon called him to his bedside by motions, and said to him, "I cannot find the will." The witness then searched for it and could not find it.  The testator then directed him to go back to the bank and get a smaller pocket-book, telling him where it could be

found.   In obedience to this request the witness went to the bank, pro-
cured the pocket book and brought it to the sick room, handing it to the
testator, stepped into the next room as before.   In a few minutes the
testator called him back into the room, and said to him, "The will is not
here."   The witness then found the package or envelope containing the
will from among the other papers contained in the wallet, and handed it
to his brother as it was, sealed up, and again retired as before.   In a
short time the testator beckoned him back to his side, handed him the
crumpled or torn pieces of paper bearing his signature to the will and
codicil, and directed him to throw them into the fire place, which the
witness did   The testator had carefully pinched or torn out his signature
in both places, from will and codicil, and in that respect placed them
in the condition in which they have since remained.   The witness then
placed the other papers in the pocket-book and replaced the will in the
·opened envelope and put it in a drawer in the room.   Some moments
after, according to the testimony, the witness concluding that it would be
better and safer for him that the mutilation of the will should be ex-
plained, he told the testator he had better write on the paper: "This will
destroyed by you," thereupon the testator, with the aid of witness, to
raise him up in bed, wrote across the will in blue lead pencil the words
"Destroyed by me, Nov. 15, 1893.   W. S. Jones"—in his own plain, usual
handwriting.   In a like manner the testator wrote on a paper which was
placed in the pocket-book: "There is no will.   W. S. Jones."   After-
wards, but on the same day, the testator requested Orville, his brother, to
see that Mary Betts, who was a favorite cousin of the testator, "should
get $2,500, and the Children's Aid Society $2,500," and afterwards asked
Orville to see to these gifts, and enjoined a solemn promise from him that
he would do so.   On being asked what the condition of the testator was
at this time, the witness, Orvile L., said, "He seemed to me pretty weak.
He was very weak, physically and mentally."   The testimony shows that
afterwards, and within a few days of the testator's death, Dr. Herrick
said to the testator, "It is evident that the case is going against us," and
asked him if he wished "to make any disposition of his property," and
the testator promptly answered "No."

It is not invidious to say that the most valuable witness called in re-
gard to the testator's condition, at this time, was Dr. H. J. Herrick, an
eminent, honorable and well known physician.   Dr. Herrick had been his
family physician for years.   It is unnecessary to give more than the briefest
summary of his evidence.   The deceased answered questions regularly and
intelligently, and still it was but momentary; he seemed to anwser with
usual intelligence, but of course he was very prostrate; unable to hold his
mind to any portracted attention for any length of time.   Speaking of
the delusions observed by other witnesses, the doctor said: "Those delu-
sions after fever might be momentary, and he might return to the normal
condition."   There was defective brain nutrition, leading to disordered
thought and inability to carry on protracted mental operation.   I remem-
ber no delusion up to November 25th.   There was despondency in his case
with regard to his recovery.   We had that to contend with all along.
Marked depression of spirits all the time a prominent feature of his case.
"I could hardly say that his mind was unsound except as that was due to
condition of system."   Despondency—lack of mental activity, as would
be produced in protracted fasting and intense protracted fever, and that
would necessarily result in mental impairment.   "Enfeebled in body
and enfeelden in mind.   That is all it means."   "From the time I called
on him, up to the 20th of November, he was apparently conscious of what
was going on around him, and expressed his feeling ordinarily."

On being asked about the consultations with Doctor Loman, who was called at Mr. Jones' own request, to examine him, and concerning certain conversations between Dr. Loman, Dr. Strong, Mr. Gilbert, of counsel, Moses Waterson and others, in which W. S. Jones' mental status was discussed, the witness said: On that occasion there never "was a question with me as to his mental integrity." I have now attempted to state fairly the substance of the recorded testimony, referring to the condition and actions of the testator during his sickness, and up to the time he destroyed or attempted to destroy his will. I have read every word of it from beginning to end, and have tried conscientiously to glean the substance of it, and state it here. I may have failed to do so. It is difficult to condense such a volume of evidence, and I may have done it in this case but indifferently.

First:  Are the facts and circumstances constituting the evidence in this case, in the light and rules and principles of law applicable thereto, sufficient to fairly and justly satisfy the court that the will of William S. Jones is unrevoked?

Second:  Considering all the facts and law in the case, was the will of the testator spoliated after the testator became incapable, by reason of insanity, of making a will?

Was the transaction of November 15th, A. D. 1893, rational? Consider the act for a moment, in relation to its own history and course of execution. What he did was entirely spontaneous and voluntary. There is not a word or syllable of evidence that the revocation of his will was suggested or thought of by any living person but himself. There is no shadow of any person or mind standing behind him to prompt, influence or control him in the slightest degree. His brother certainly took no responsibility in that direction. The whole course of action of Orville L. Jones, in regard to that matter, was consistent, and consistent only, with the fact that the revocation of his brother's will was valid in his opinion. He afterwards represented the estate to be intestate, and with full knowledge of all that had transpired, procured administration to be committed to himself. Orville L. Jones has acted honestly and fairly in this whole matter. He is too intelligent, too capable, and too fair a gentleman to be unduly influenced in a matter of such importance.

The testator manifested persistency of intention to revoke his will. The purpose was formed on the 14th of November, and was not forgotten on the 15th. Failing in finding the document in one place, he remembered that it might be in another receptacle in the same place of deposit. He purposed and intended to lay hands on his will, and was not in quest of any other paper. He resorted to the very method and mode of destruction sufficient to raise the presumption of intention to revoke. It was the same method and means of revocation used by him in the case of a former will, when there was no shadow of testamentary weakness. He acted in a deliberate and orderly manner in removing his signatures. By his declaration and acts subsequently in directing the gifts to be made to two of the legatees, and invoking the solemn sanction of the promise of an only brother to a dying brother, he gave the strongest evidence that he fully understood the effect of his act upon his will. There could be no doubt that he understood that he was going to die intestate.

Was he an insane man at this time? He was very weak, and was approaching his end, and he was conscious of that fact. That his mind wandered—that he was beset with shadows, dreams, visions and vagaries at times, there can be no doubt. But at these times a single word or rational question addressed to him restored him to his normal condition. He was not called upon to plan and formulate a new scheme of disposi-

tion. He understood the scope and provisions of "the will the law made for him " He intended to adopt that will," "and die intestate. There was no delusions that remained settled and irradicable. He had no antipathies toward any legatee or beneficiary under his will, and no false imaginations or delusions touching the subject of any testamentary matter. It is said that the act was grossly and shockingly unnatural and unreasonable because in doing it, he abruptly and unaccountably turned away from the cherished purposes of his life to bestow his benefaction in a noble and beautiful memorial to father and mother upon the worthy charitable institutions mentioned in his will. That most unaccountable of all, he suddenly forgot his promises and protestations of love to Mrs. Campbell by depriving her of the legacies provided in his will. It is not the duty of the court to find the ultimate motives which actuated the testator. If he had sufficient capacity, considering all the acts and circumstances, the court must not sit in judgment on the justice or wisdom of his motives. It is true that all the results of his course in dealing with his will are proper subjects of investigation. In that supreme hour we cannot obtain his exact point of view, nor know all that passed through his mind. He was aware of the effect of his act upon his will; he understood that perfectly, as evidenced by the fact that he directed gifts to two of the favored legatees. He would naturally prefer to sustain and favor his benefaction to the Children's Aid Society, and it was but natural he should discriminate between this institution and the other charitable beneficiaries, as he had for many years been treasurer of the Chidren's Aid Society. He was about to die. He knew his relations with Mrs. Campbell were about to end. He had dealt honorably and generously with her He was in the daily and hourly presence of his mother—that mother to whom he had never confided the secret of his relations and purposes with Mrs. Campbell. To his mother he was most devotedly attached. She was to survive him, and for the first time in her last days, was to be confronted with the public record of a fact, which, in the closest filial intimacy, he had never had the courage to disclose to her. She had been the innocent cause of the postponement of his marriage; a postponement, all things considered, certainly as unaccountable as the revocation of his will. That strong filial and family affection for his mother and kindred, asserted its sway, and he resolved that he would die intestate. He had a perfect right to so determine, in my judgment he being in a condition of testamentary capacity, according to the settled law, as applied to this case. The revocation of his will was his last valid testamentary act; it must be so found.

After mature consideration, with a conscious sense of my responsibility in this difficult and important case, I find that the will and codicil propounded are not unrevoked; that on this essential proposition as a condition precedent to admitting the will to probate, the case made by the proponents, properly and justly considered, is not sustained, and it follows that neither the will nor codicil were spoliated, but revoked by the testator, and were not in existence at his death; probate therefore is refused, and the application dismissed.

H. C. Ranney, Henderson, Kline & Tolles, Judge Phillips, and Squire, Sanders & Dempsey, attorneys for proponents.

Hon. J. M. Jones, W. J. Hamilton, Esq., and Gilbert & Hill, for contestants.